CALABRIA, Judge.
Seraph Garrison, LLC ("plaintiff") appeals from an order and judgment denying its claims, which were brought derivatively and on behalf of Garrison Enterprises, Inc. ("GEI" or "the corporation"), against Cameron Garrison ("defendant"). For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.
I. Background
GEI, a North Carolina corporation, was founded by defendant in July 2000. The corporation primarily worked with government entities to supply health inspection software for the input of data for various types of restaurants and government agencies; it also sold software and data related to restaurant inspections, and other types of inspections, to private companies. Defendant was *402 President and CEO of GEI from its founding until the corporation's board of directors (the "Board") terminated his employment in December 2010. During this time period, defendant's father, mother, sister, and three brothers were employed at GEI. In his role as President and CEO, defendant was tasked with ensuring that all required tax payments on behalf of GEO were made to the United States Department of Revenue and the North Carolina Department of Revenue. Defendant was also responsible for making contributions to GEI's 401(k) Plan.
On 20 December 2010, plaintiff, a Georgia limited liability company and shareholder of GEI, sent a demand letter to GEI's Board requesting an investigation regarding, inter alia, defendant's "potential breaches of fiduciary duty." Three days later, the Board terminated defendant's employment with GEI but it refused to take further action against him. Responding to the Board's refusal, plaintiff instituted a derivative action on behalf of GEI to recover losses that purportedly resulted from defendant's conduct during his tenure as President and CEO. In its verified complaint, which was filed in Mecklenburg County on 22 July 2011, plaintiff alleged that defendant breached his fiduciary duties to GEI, committed actual fraud against the corporation, and engaged in unfair and deceptive trade practices.
Specifically, plaintiff alleged that for "various periods beginning in 2008 and ending in 2010," defendant stopped remitting payroll taxes to the federal and North Carolina state governments. Plaintiff further alleged that defendant failed to make required contributions to GEI's 401(k) Plan from February 2008 until his termination in December 2010. Finally, plaintiff alleged that defendant deceived the Board by misrepresenting the terms of a licensing contract he negotiated with Ecolab, a company that sells cleaning supplies to the hospitality, food service, and health care industries. Based on these allegations, plaintiff sought to recover damages based on unjust enrichment and the imposition of resulting and constructive trusts. Plaintiff also sought punitive damages.
Subsequently, the case was designated as a complex business case and assigned to Judge Calvin E. Murphy, Special Superior Court Judge for Complex Business Cases. On 23 November 2011, defendant filed an answer and counterclaims. When the matter came on for trial in June 2014, defendant failed to appear. As a result, Judge Murphy conducted a bench trial, where plaintiff presented testimony from Rahul Saxena ("Saxena"), who became GEI's interim President and CEO upon defendant's termination, and Paul Saltzman ("Saltzman"), who the trial court designated an expert in business valuation, income tax, and accounting. After trial, the court entered an order and judgment that granted plaintiff's claim for breach of fiduciary duty based on defendant's misrepresentations regarding the Ecolab contract. However, all of plaintiff's remaining claims were denied, and no damages were awarded on any claims.[1] The trial court Plaintiff appeals.
II. Analysis
A. Standard of Review
"The standard of review on appeal from a judgment entered after a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." Cartin v. Harrison, 151 N.C.App. 697, 699, 567 S.E.2d 174, 176 (2002) (quotations omitted). "Where such competent evidence exists, this Court is bound by the trial court's findings of fact even if there is also other evidence in the record that would sustain findings to the contrary." Willen v. Hewson, 174 N.C.App. 714, 718, 622 S.E.2d 187, 190 (2005) (citation omitted). The trial court's conclusions of law, however, are subject to de novo review. Id. (citation omitted).
B. Plaintiff's Claims For Unfair And Deceptive Trade Practices
As an initial matter we note that the trial court denied plaintiff's unfair and deceptive trade practices claim based on its conclusion that N.C. Gen.Stat. § 75-1.1 did not *403 apply to this case. We agree with this conclusion. See White v. Thompson, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010) (finding section 75-1.1 inapplicable to the internal conduct of a single business). Furthermore, since defendant does not challenge the court's conclusion on appeal, he has abandoned the issue. N.C.R.App. P. 28(b)(6) (2015) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). Thus, we affirm the trial court's denial of plaintiff's unfair and deceptive trade practices claim.
C. Plaintiff's Claims For Breach of Fiduciary Duty and Fraud
Before addressing plaintiff's fiduciary duty and fraud claims, we begin by noting some principles that should animate any judicial evaluation of corporate conduct. First, under North Carolina law, corporate officers with discretionary authority must discharge their duties:
(1) In good faith;
(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
(3) In a manner he reasonably believes to be in the best interests of the corporation.
N.C. Gen.Stat. § 55-8-42(a) (2015). Corporate directors are charged with the same standard of conduct. Id. § 55-8-30(a)(1)-(3). Although the word "fiduciary" is not used in these provisions, the Official Comment to section 55-8-30 explains "there is no intent to change North Carolina law in this area. The decision not to bring forward the language ... in former [N.C. Gen. Stat.] § 55-35[-which provided that officers and directors stand in a fiduciary relation 'to the corporation and to its shareholder'-]is not intended to modify in any way the duty of directors recognized under the former law." Consequently, the earlier cases that examine and delineate the duties of directors and officers continue to be effective.
Under these cases, corporate directors and officers act in a fiduciary capacity in the sense that they owe the corporation the duties of loyalty and due care. Belk v. Belk's Dep't Store, Inc., 250 N.C. 99, 103, 108 S.E.2d 131, 135 (1959) (recognizing a director's "duty to honestly exercise[ ]" his powers "for the benefit of the corporation and all of its shareholders"); Loy v. Lorm Corp., 52 N.C.App. 428, 436, 278 S.E.2d 897, 903 (1981) ( "Directors owe a duty of fidelity and due care in the management of a corporation and must exercise their authority solely for the benefit of the corporation and all its shareholders."); Pierce Concrete, Inc. v. Cannon Realty & Const. Co., 77 N.C.App. 411, 413-14, 335 S.E.2d 30, 31 (1985) (declaring that the fiduciary duty corporate officers owe to North Carolina corporations "is a high one").
Subdivision 55-8-42(a)(2) outlines the standard by which an officer's duty of care is measured. Its specific language-in a "like a position" and "under similar circumstances"-acknowledges officers' that responsibilities will vary from corporation to corporation. The same holds true for the corporate decision-making processes that are employed. Even so, subdivision 55-8-42(a)(2) also imposes an affirmative duty on officers: it requires them to assume an active and direct role in the matters that are under their authority. Anthony v. Jeffress, 172 N.C. 378, 379, 90 S.E. 414, 415 (1916) (considering it "immaterial whether the [directors] were cognizant of the ... company['s insolvency] or not [when they declared a dividend]. The law charges them with actual knowledge of its financial condition, and holds them responsible for damages sustained by stockholders and creditors by reason of their negligence, fraud, or deceit."); F-F Milling Co. v. Sutton, 9 N.C.App. 181, 184, 175 S.E.2d 746, 748 (1970) (stating that corporate directors in North Carolina may be held personally liable for, inter alia, gross neglect of their duties and mismanagement).
Subdivision 55-8-42(a)(3) codifies the requirement that an officer always discharge the responsibilities of the office "with undivided loyalty" to the corporation. Meiselman v. Meiselman, 309 N.C. 279, 307, 307 S.E.2d 551, 568 (1983). The corporate law duty of loyalty also imposes an affirmative obligation: a fiduciary must strive to advance *404 the best interests of the corporation. In re The Walt Disney Co. Derivative Litig., 2004 WL 2050138, at *5 n. 49 (Del.Ch. Sept. 10, 2004) (stating that the duty of loyalty "has been consistently defined as 'broad and encompassing,' demanding of a director 'the most scrupulous observance.' To that end, a director may not allow his self-interest to jeopardize his unyielding obligations to the corporation and its shareholders") (citation omitted).
Second, while subsection 55-8-42(a) requires an officer to act in good faith, this concept cannot be separated from the duties of loyalty and due care. In other words, the obligation to act in good faith does not create a discrete, independent fiduciary duty. Rather, good faith is better understood as an essential component of the duty of loyalty. See Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 369-70 (Del.2006)[2] ("The failure to act in good faith may result in liability because the requirement to act in good faith 'is a subsidiary element[,]'[i.e., a condition,] 'of the fundamental duty of loyalty.' "). A leading authority on North Carolina business law has also recognized this obligation as a component of the duty of due care: "The requirement of good faith is listed separately in [subsections 55-8-30(a) and 55-8-42(a),] ... but it normally operates ... as a component of the other two traditional duties, requiring conscientious effort in discharging the duty of care and constituting the very core of the duty of loyalty." Russell M. Robinson, II, Robinson on North Carolina Corporation Law § 14.02, 14-7 (7th ed.2015); see also Jeffress, 172 N.C. at 380, 90 S.E. at 415 ("Good faith alone will not excuse [directors] when there is lack of the proper care, attention, and circumspection in the affairs of the corporation [.]") (emphasis added). Thus, the requirement of good faith is subsumed under an officer's duties to the corporation; it is a primary and comprehensive obligation that compels an officer to discharge his responsibilities openly, honestly, conscientiously, and with the utmost devotion to the corporation. See Black's Law Dictionary 762 (9th ed.2009) (defining "good faith" in pertinent part as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, ... [and] (4) absence of intent to defraud or to seek unconscionable advantage").
Third, context matters: the analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which he serves the corporation. Robinson at § 16.07 (noting that officers' "greater familiarity with the affairs of the corporation ... may subject them to higher scrutiny and expectations" than some directors, and that an officer's good faith and adherence to his duty of loyalty are "defined in terms of the particular individual's position, so that one with a higher level of authority would naturally have greater responsibilities"); TW Servs., Inc. v. SWT Acquisition Corp., Nos. 10427, 10298, 1989 Del. Ch. LEXIS 19, *28 n. 14, 1989 WL 20290, *8 n. 14 (Del.Ch. Mar. 2, 1989). "[N]o matter what our model [of corporate law], (it must be flexible enough to recognize that the contours of a duty of loyalty will be affected by the specific factual context in which it is claimed to arise...."). The same holds true for any examination of "good faith," an inquiry that presents a mixed question of law and fact:
Whether a party has acted in good faith is a question of fact for the trier of fact, but the standard by which the party's conduct is to be measured is one of law. In making the determination as to whether a party's actions constitute a lack of good faith, the circumstances and context in which the party acted must be considered.
Farndale Co., LLC v. Gibellini, 176 N.C.App. 60, 67-68, 628 S.E.2d 15, 19 (2006) (citation omitted).
Fourth, the standard of conduct outlined in section 55-8-42 is subject to review under the business judgment rule. While the application of the business judgment rule in North Carolina has been rather sparse, it *405 is clear that our courts do apply the rule.[3] See, e.g., Ehrenhaus v. Baker, 216 N.C.App. 59, 91, 717 S.E.2d 9, 30 (2011) ; State ex rel. Long v. ILA Corp., 132 N.C.App. 587, 602, 513 S.E.2d 812, 821-22 (1999) ; Swenson v. Thibaut, 39 N.C.App. 77, 107, 250 S.E.2d 279, 298 (1978) ; N. Carolina Corp. Comm'n v. Harnett Cty. Trust Co., 192 N.C. 246, 134 S.E. 656, 657 (1926). This Court has formulated the rule as follows:
[The business judgment rule] operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.
ILA Corp., 132 N.C.App. at 602, 513 S.E.2d at 821-22. As a general matter, post hoc judicial review of corporate action should not serve as a platform for second-guessing the business decisions of officers and directors. HAJMM Co. v. House of Raeford Farms, 94 N.C.App. 1, 10, 379 S.E.2d 868, 873 ("We are also mindful that the business judgment rule protects corporate directors from being judicially second-guessed when they exercise reasonable care and business judgment."), review on additional issues allowed, 325 N.C. 271, 382 S.E.2d 439 (1989), and modified, aff'd. in part, rev'd in part on other grounds, 328 N.C. 578, 403 S.E.2d 483 (1991). Nevertheless, to receive the benefit of the business judgment rule, an officer or director must discharge his duties in compliance with the requirements of subdivision 55-8-42(a). See In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 124 (Del.Ch.2009) (holding that absent proof of bad faith, conflict of interest, or disloyalty, officers' and directors' business decisions will not be second-guessed if they are "the product of a rational process," and the officers and directors "availed themselves of all material and reasonably available information" and honestly believed they were acting in the corporation's best interests) ((citation and footnote omitted)).
With these principles in mind, we turn to plaintiff's claims for breach of fiduciary duty and fraud.
1. Payroll Taxes and 401(k) Contributions: Breach of Fiduciary Duty
Plaintiff contends the trial court erred in concluding that defendant's failure to remit payroll taxes and make 401(k) contributions did not constitute a breach of his fiduciary duties. We agree.
From at least 2008 until the end of 2010, defendant caused GEI to stop paying state and federal payroll taxes. Defendant also stopped making contributions to GEI's 401(k) Plan during this time period. When defendant was terminated in December 2010, GEI owed the federal government approximately $1.6 million in back taxes. The tax delinquency caused several problems for GEI: penalties were incurred, interest accrued, and corporate assets were frozen for a period of time. As a result of the 401(k) contribution delinquency, the North Carolina Department of Labor filed a complaint against GEI and defendant in his individual capacity. According to defendant's deposition, because cash flow was tight at GEI during the period in question, he chose to pay employees and keep the corporation running instead of paying taxes and making contributions.
Based on plaintiff's evidence, the trial court found that there was no proof that defendant's failure to pay payroll taxes and make 401(k) contributions fell below the standard of conduct required by subsection 55-8-42(a). The court also found that defendant neither hid the tax delinquency from the Board nor prevented the Board from intervening to reduce the tax liability. As a result, the court concluded that "given GEI's *406 cash crunch," plaintiff did not present sufficient evidence that defendant's plan of management amounted to a breach of fiduciary duty. Because defendant failed to discharge his duties according to law, the trial court's conclusion was reached in error.
Defendant's failure to make the required payments violated both federal and state law. For example, federal law provides that amounts withheld for payroll taxes and 401(k) plan contributions are held in trust for the government and employees, respectively, and must be used by the employer solely for the purpose of making the required payments to the government or to the 401(k) plan. See, e.g., 26 U.S.C. §§ 7501, 6672 ; 29 U.S.C. §§ 1103, 1132. The federal Internal Revenue Code ("the Code") specifically requires employers to withhold payroll (i.e., social security and excise) taxes from their employees' wages. An employer's "[p]ayment of ... [payroll] taxes is 'not excused' merely because 'as a matter of sound business judgment, the money was paid to suppliers .. in order to keep the corporation operating as a going concern-the government cannot be made an unwilling partner in a floundering business.' " Erwin v. United States, 591 F.3d 313, 319 (4th Cir.2010) (internal brackets and citation omitted). To assure an employer's compliance with its obligation to remit payroll taxes, the Code imposes personal liability on officers or agents of the employer who are responsible[4] for the employer's decisions regarding withholding and payment of the taxes and who willfully fail to do so. 26 U.S.C. §§ 6672(a), 6671(b).
Whether a "responsible person" willfully failed to collect, account for, or remit payroll taxes depends primarily on whether the person had "knowledge of nonpayment or reckless disregard of whether the payments were being made." Erwin, 591 F.3d at 325. "[W]hen a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay back those taxes." Id. at 326. To that end, the Fourth Circuit has held that a director acted willfully in failing to remit delinquent payroll taxes when she knew that such taxes for numerous quarters remained unpaid and continued to direct corporate payments to herself and other creditors. Johnson v. United States, 734 F.3d 352, 364-65 (4th Cir.2013) (citing 26 U.S.C.A. § 6672 ).
In the instant case, defendant, a "responsible person," knew that payroll taxes for quarters from 2008 to 2010 remained unpaid during his tenure as a GEI officer-he caused the delinquency himself. However, despite this knowledge, unencumbered corporate funds were used to pay defendant's salary and car allowance. When the Board questioned defendant on the payroll tax issue, he claimed to be working with the IRS but stated that "it was on the bottom of the pile." Defendant continued to skirt the issue when the Board followed up on it. Notably, Saxena testified that although corporate expenses were high, GEI's revenue was sufficient to pay the payroll taxes and make 401(k) contributions. Saxena also testified that there was no legitimate reason for defendant's failure to make the required payments and contributions. All told, defendant's failure to remedy the payroll tax deficiencies was willful as a matter of law. See id. at 364-65 ("[D]uring the ... delinquent tax periods, Mrs. Johnson received well in excess of $500,000 in compensation and benefits from the corporation while the payroll taxes went unpaid.").
This Court has held that failure to comply with the statutory procedures required for a corporate merger "constitutes a breach of a director's fiduciary duty[.]" Loy, 52 N.C.App. at 435, 278 S.E.2d at 902-03. One principle emanating from Loy is that a director or officer's failure to ensure the corporation is operated according to law amounts to a breach of fiduciary duty. Plaintiff's evidence established defendant's indifference to the payroll tax and 401(k) contribution deficiencies, which presented the corporation with a myriad of legal problems. It is irrelevant that defendant neither hid these liabilities from the Board nor prevented the Board *407 from addressing them-his conduct violated subsection 55-8-42. By deliberately neglecting two of his primary corporate responsibilities, and violating federal and state law in the process, defendant failed to act with due care and in good faith to GEI. And since defendant had actual knowledge of the tax and contribution liabilities, he also breached his duty of loyalty by engaging in conduct that injured the corporation. Given the facts of this case, the business judgment rule cannot protect defendant's failure to remedy problems he both created and ignored. Defendant had actual knowledge of the Accordingly, the trial court erred in concluding that defendant did not breach his fiduciary duty to GEI by causing the corporation to become delinquent on its payroll taxes and 401(k) contributions.
2. Ecolab Contract: Fraud and Breach of Fiduciary Duty
Plaintiff next argues that the trial court erred in concluding that damages could not be awarded on its fraud claim because plaintiff failed to establish the Board's reasonable reliance on defendant's misrepresentations regarding the Ecolab contract. We agree.
While an officer at GEI, defendant had the sole responsibility for all contract negotiations with third parties. In early 2009, defendant began negotiating a contract with Ecolab to provide data from government agencies that conduct health inspections on restaurants. According to defendant's deposition, he pledged to keep the Board apprised of the negotiations and to submit the contract for Board review before it was executed. To that end, defendant submitted a draft that was reviewed and edited by GEI's corporate counsel and approved by the Board.
On 10 August 2009, defendant circulated to the Board a "final" version of the contract, which purportedly had been executed by GEI and Ecolab on 1 July 2009 (the "July Contract"). GEI undertook its relationship with Ecolab based on the Board's understanding that the July Contract's terms were in effect. However, defendant had actually executed a different version of the Ecolab contract on 1 August 2009 (the "August Contract"). Ecolab paid GEI $1,000,000 as an up-front exclusivity payment ("initial payment") for executing the August Contract. Defendant used a portion of those funds to repay himself for a loan he had previously made to GEI, and to pay his salary, car allowance, and the salaries of other employees. Sometime in late 2010, at a meeting between GEI and Ecolab representatives, Saxena learned of the August Contract's existence. He also learned that the August Contract's terms-which were particularly unfavorable to GEI-governed the parties' relationship and that the July Contract had never been executed by Ecolab.
After having a third-party law firm conduct an investigation, the Board determined that Ecolab's signature on the July Contract was a forgery and that the August Contract was valid. At this point in time, GEI could not repudiate the August Contract. Even more problematic were the material differences between the two contracts: the July Contract required Ecolab to pay up to $2,550,000 in exclusivity fees, while the August Contract provided for only $1,300,000 in such fees; the July Contract permitted GEI to maintain existing contracts with large restaurant chains, but the August Contract required GEI to terminate its preexisting contracts with third parties; the July Contract granted GEI and Ecolab equal rights of termination after ten years, but the August Contract could be terminated only by Ecolab after ten years; the August Contract prohibited GEI from pursuing new contracts unless Ecolab approved, but the July Contract allowed GEI to enter into such contracts under certain conditions. The August Contract also contained provisions that granted Ecolab exclusive rights to GEI's intellectual property, including its software. In Saxena's view, the August Contract effected a sale of GEI to Ecolab for $1,300,000.
Based on this evidence, the trial court found that the August Contract "was financially detrimental to [GEI]." However, the trial court also found that none of the evidence established that defendant was required to seek the Board's approval before entering into contracts on behalf of GEI. Based on this finding, the court concluded *408 that while defendant breached his fiduciary duty by purposefully misleading the Board as to the July Contract, GEI was only damaged by the August Contract's execution. In the court's view, even though the August Contract's terms might have embodied a "bad business deal," defendant's execution of that contract did not constitute a breach of fiduciary duty. The court reached a similar conclusion on plaintiff's fraud claim:
[47] As previously noted, the Court is unconvinced that [d]efendant was obligated to seek Board approval before entering into the Ecolab contract. And, even if [d]efendant were [sic] required to seek Board approval, the approval given was for the July 2009 unexecuted contract and not for the August 2009 executed contract. The only step the Board took in reliance on [d]efendant's misrepresentations was to approve the July 2009 contract, which was never executed. Defendant's representations could not have caused the Board to approve the August 2009 contract because, as Saxena testified, the Board was not aware of its existence until months after it had been executed. Therefore, the Court does not conclude that the Board relied on [d]efendant's misrepresentation to [GEI's] detriment such that an award of damages would be proper under [p]laintiff's fraud claim.
After denying plaintiff's fraud claim and granting its breach of fiduciary claim (as to the Ecolab contract), the court refused to award any compensatory damages based on the following rationale: "It was not [d]efendant's misrepresentation [regarding the July Contract] to the Board that caused damage to GEI. Rather, it was his signing of the August ... Contract that created the problem for the company, but such was not a breach of his fiduciary duty."
By focusing on defendant's affirmative misrepresentation regarding the July Contract, the trial court diminished the legal significance of his concealed execution of the August Contract and engaged in flawed reasoning. Our Supreme Court has recognized that actual fraud "has no all-embracing definition[.]" Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974) (citations omitted). Even so, a prima facie case for fraud consists of the following elements: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the [deceived] party." Id. Additionally, the deceived party must have reasonably relied on the allegedly false representations. Forbis v. Neal, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (citation omitted).
As noted above, the trial court analyzed only defendant's misrepresentation as to the July Contract; it did not address defendant's concealment of material facts (the August Contract's terms and execution). Consequently, the court found that plaintiff met all the essential elements of fraud but failed to prove reasonable reliance causing detriment.
Although reasonable reliance is generally required, the existence of a confidential or fiduciary relationship creates a duty to fully disclose material facts. Vail v. Vail, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951). When the duty to disclose is breached, fraud has been committed and the deceived party need not prove reasonable reliance. Id. Indeed, in the context of fiduciary relationships, the law excuses a deceived party's failure to exercise reasonable diligence, as the duty to investigate is subordinate to the duty of full disclosure:
[T]he failure of the defrauded person to use diligence in discovering the fraud may be excused where there exists a relation of trust and confidence between the parties. This is so for the reason that a confidential or fiduciary relation imposes upon the one who is trusted the duty to exercise the utmost of good faith and to disclose all material facts affecting the relation.
Id. (internal quotation marks and citation omitted); see also Everts v. Parkinson, 147 N.C.App. 315, 325, 555 S.E.2d 667, 674 (2001) (holding that a plaintiff need not prove reasonable reliance upon proving breach of duty to disclose, as the elements are virtually identical to what is already required to establish the very duty to disclose).
*409 In the instant case, defendant committed two species of fraud: he concealed the August Contract's terms from the Board, and he falsely represented that the July Contract was in effect. The trial court found that defendant misled the Board by "purposefully present[ing] the Board with [the July Contract] when he knew that another, detrimental version had already been executed." Given the fiduciary duties that subsection 55-8-42(a) imposed on defendant, plaintiff had to prove only that the law obligated defendant to disclose the information he concealed. Even a cursory review of the record reveals that defendant's calculated misrepresentation relating to the July Contract allowed him to conceal the negotiation, execution, and existence of the August Contract. It is equally clear that the Board detrimentally incorporated defendant's misrepresentations into its decision-making process: GEI commenced its relationship with Ecolab based on the July Contract, which the Board believed to be valid and binding; and if the August Contract's terms had been disclosed, it is reasonably certain that the Board would have attempted to repudiate the agreement.[5] Yet the trial court reasoned that defendant's misrepresentations did not induce the Board to enter into the August Contract. This reasoning was flawed. Defendant's act (representing that the July Contract was executed) and omission (concealing the August Contract), which were not taken in good faith, were inextricably linked. It was illogical to conclude that reliance was required in this instance and that such reliance, if required, could only be established by proving the Board relied on information that defendant deliberately concealed. As a corporate officer reporting to the Board, defendant had an affirmative, fiduciary duty to disclose all material facts related to the Ecolab contract negotiations. Since he failed to do so, plaintiff was not required to prove the reliance element of actual fraud, Vail, 233 N.C. at 116, 63 S.E.2d at 207, and the trial court erred in imposing such a requirement. Accordingly, we reverse the trial court's conclusion that plaintiff failed to establish the elements of actual fraud in relation to the Ecolab contract.
Defendant not only breached his fiduciary duties through misrepresentations and concealment, he also breached them by using the initial payment from Ecolab for his personal benefit. Saltzman acknowledged that when defendant repaid himself for a loan he purportedly made to GEI, he "put himself first in the line of creditors." The record also demonstrates that, had funds from the initial payment flowed through the corporation correctly, other creditors-the federal government, employees, and GEI itself-would have been paid before defendant. Defendant repaid himself at a time when GEI was facing serious legal consequences from the federal and state governments. Those consequences stemmed directly from defendant's failure to remit payroll taxes and make required 401(k) contributions. As such, defendant engaged in a certain form of self-dealing: he used proceeds from a corporate contract to benefit himself and his interests at the expense of GEI. Because the requirement of good faith requires officers to avoid self-dealing, see Freese v. Smith, 110 N.C.App. 28, 38, 428 S.E.2d 841, 848 (1993) (noting that defendant-director "was under a statutory mandate to act in good faith and not to engage in any self[-]dealing"), defendant breached his duty of loyalty to GEI. See ILA Corp., 132 N.C.App. at 597, 513 S.E.2d at 819 (holding that a director engaged in self-dealing and breached his fiduciary duty by directing proceeds from a purchase of corporate stock to repay a debt to another company that he controlled).
D. Unjust Enrichment, Resulting Trust, and Constructive Trust
Plaintiff argues that the trial court erred by denying its claims for unjust enrichment, resulting trust,[6] and constructive trust.
*410 A constructive trust is an equitable remedy " '... imposed by courts ... to prevent the unjust enrichment of the holder of title to, or of an interest in, property which [was] acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.' " United Carolina Bank v. Brogan, 155 N.C.App. 633, 636, 574 S.E.2d 112, 115 (2002) (citations omitted). Failure to establish a fraud claim is not determinative of a constructive trust claim; "[i]t is sufficient that legal title has been obtained in violation, express or implied, of some duty owed to the one who is equitably entitled." Colwell Elec. Co. v. Kale-Barnwell Realty & Const. Co., 267 N.C. 714, 719, 148 S.E.2d 856, 860 (1966) (citation omitted); see also Roper v. Edwards, 323 N.C. 461, 465, 373 S.E.2d 423, 425 (1988) (stating that the existence of fraud need not be established if the facts of the case necessitate imposition of a constructive trust).
This Court has defined unjust enrichment as a
legal term characterizing the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself or herself at the expense of another....
Adams v. Moore, 96 N.C.App. 359, 362, 385 S.E.2d 799, 801 (1989) (citation and brackets omitted). Since an unjust enrichment claim involves a restitution-type recovery, a plaintiff need not have actual damages:
The main purpose of the damages award is some rough kind of compensation for the plaintiff's loss. This is not the case with every kind of money award, only with the damages award. In this respect, restitution stands in direct contrast to the damages action. The restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep. A plaintiff may receive a windfall in some cases, but this is acceptable in order to avoid any unjust enrichment on the defendant's part. The principle of restitution is to deprive the defendant of benefits that in equity and good conscience he ought not to keep ... even though plaintiff may have suffered no demonstrable losses.
Booher v. Frue, 86 N.C.App. 390, 393-94, 358 S.E.2d 127, 129 (1987) (alteration, quotation marks, and citations omitted).
Plaintiff's constructive trust and unjust enrichment claims were based on its allegations that defendant paid himself and received benefits-such as a car allowance-during the period that the payroll tax and 401(k) contribution delinquencies occurred. These claims were also based on the allegation that defendant used a portion of the initial payment ($124,451) from the August Contract to repay himself for a loan he made to GEI. The trial court rejected both claims, finding that: (1) defendant did not breach his fiduciary duty by failing to remit payroll taxes or make 401(k) contributions; (2) "by entering into a bad business deal, [d]efendant [did not] forfeit[ ] his right to earn and be paid a salary and car allowance"; and (3) "even if [d]efendant did repay a loan he made to GEI in accordance with Saltzman's testimony, there is insufficient evidence that he was not entitled to such repayment."
As to the $124,451 loan repayment, the trial court erred by refusing to grant plaintiff's claim under either a constructive trust or unjust enrichment theory. We have already held that defendant breached his fiduciary duty in directing the repayment to himself. In the context of this case, it is *411 irrelevant whether defendant was entitled to repayment-he claimed those funds at a time when his actions (and inactions) caused GEI to incur significant legal and financial liabilities. Specifically, he used discretionary funds from the initial payment to benefit himself instead of making mandatory payments to the federal and state governments.
As to whether plaintiff was entitled to recover all or a portion of defendant's salary and benefits that were taken from the initial payment, we remand the issue to the trial court for further consideration. The trial court took issue with Saltzman's analysis of losses GEI suffered related to plaintiff's unjust enrichment and constructive trust claims, finding that he "never presented evidence on" those claims. We agree with this finding subject to one exception: Saltzman did discuss the $124,451 loan repayment. As a result, plaintiff cannot recover losses related to defendant's salary and benefits pursuant to its unjust enrichment and constructive trust claims. However, since we have reversed the court on the breach of fiduciary duty and fraud claims, it should consider whether plaintiff may recover any losses related to defendant's salary and benefits (taken from the initial payment) may be recovered as compensatory damages.
E. Damages Issues
1. Punitive Damages
Plaintiff next contends that because the trial court erred in denying compensatory damages, the court also erred in failing to consider an award of punitive damages. We agree.
N.C. Gen. Stat. § 1D-15 (2015) provides, in pertinent part, that:
(a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
(1) Fraud[;]
(2) Malice[; or]
(3) Willful or wanton conduct.
(b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.
"For the tort of fraud, the aggravating factor may be intrinsic to the tort." Hudgins v. Wagoner, 204 N.C.App. 480, 493, 694 S.E.2d 436, 446 (2010) ; see also Stone v. Martin, 85 N.C.App. 410, 418, 355 S.E.2d 255, 260 (1987) ("Since fraud is present in [this] case ..., additional elements of aggravation are unnecessary.") (citation omitted).
Here, the trial court found that GEI was not "injured by [d]efendant's breach of fiduciary duty by misrepresenting" the Ecolab contract's terms. As this was "the only actionable portion of all [p]laintiff's claims," the trial court concluded that plaintiff was not entitled to compensatory damages from defendant. Consequently, the court refused to consider the issue of punitive damages.
Since the trial court erroneously concluded that plaintiff failed to prove actual fraud-a potential aggravating factor under section 1D-15 -and since compensatory damages may be awarded for defendant's fraud and breach of fiduciary duty claims, the court should consider the issue of punitive damages on remand.
2. The Trial Court's Rejection of Saltzman's Loss of Value Evaluation
In its final argument, plaintiff contends that the trial court erroneously rejected Saltzman's calculation of GEI's loss of value that was caused by defendant's actions. Once again, we agree.
At trial, Saltzman explained that his analysis focused on the fair market value of GEI in 2009, when defendant negotiated the Ecolab contract. In assessing GEI's fair market value, Saltzman mainly considered three different third-party offers to purchase GEI: (1) $10,500,000 on 24 November 2009; (2) $7,000,000 on 17 August 2010; and (3) $6,000,000 on 6 November 2009. He also discussed later, additional offers: a $5,000,000 offer from Ecolab in November 2010, and a $2,000,000 offer which was tendered in 2013. Saltzman concluded that the $6,000,000 offer provided the best starting point for calculating GEI's loss of value, explaining *412 that he "took the lowest of the three [offers] that were in that time period" and that "[t]he [$6,000,000] figure was the closest date to the" negotiation of the July and August Contracts. After basing his calculations on the $6,000,000 offer, Saltzman concluded it was reasonably certain GEI had lost $510,531 in value.
However, the trial court rejected Saltzman's use of the $6,000,000 figure:
Saltzman's use of $6,000,000 in his calculation of loss of value appears to be based on convenience and very little methodology. There were other figures he could have used to represent expression of interest in purchasing GEI that were close to the timing of the Ecolab contract, including one number lower than he selected. Saltzman affirmatively opted not to use an average value. It appears to the Court that Saltzman simply chose a convenient number to base his loss of value calculation on, which the Court finds unpersuasive.
Based on our review of the record, we conclude that these findings were unsupported by the evidence. To begin, the trial court's insinuation that an average value would have been more appropriate makes little sense. An average of the three 2009 offers would have set Saltzman's starting point at approximately $7,800,000; an average of all five offers would have yielded a $6,100,000 starting point. In addition, the "lower" offer the court discussed-apparently a reference to the $5,000,000 Ecolab offer-was contingent on certain revenue requirements and was, thus, not comparable to the $6,000,000 offer. Finally, the court's finding that defendant "simply chose a convenient number" was unjustified. Saltzman explained his methodology and testified that he took the lowest offer that was close in time to the Ecolab contract's execution. Overall, Saltzman's assessment of GEI's loss of value was calculated with reasonable certainty. See Iron Steamer, Ltd. v. Trinity Rest., Inc., 110 N.C.App. 843, 847, 431 S.E.2d 767, 770 (1993) (recognizing that damages for loss of corporate profits must be ascertained with "reasonable certainty") (citation omitted). Consequently, the trial court erred in rejecting his $510,531 loss of value estimate.
III. Conclusion
Defendant breached his fiduciary duties to GEI by failing to remit payroll taxes and make 401(k) contributions that were required by federal and state law. He also breached his fiduciary duties by appropriating funds from the Ecolab contract initial payment for his personal benefit-the repayment of a loan he made to GEI-to the detriment of the corporation. By concealing the existence of the binding August Contract, defendant committed actual fraud against GEI. Since compensatory damages may be awarded on this claim, the trial court should consider the issue of punitive damages on remand. Furthermore, because we have reversed the trial court on virtually all of plaintiff's claims, the court should consider anew the issue of compensatory damages as they relate to the claims of breach of fiduciary duty and fraud. Plaintiff is entitled to recover the $124,521 loan repayment pursuant to its constructive trust and unjust enrichment claims, and the trial court should reconsider whether the salary and benefits defendant received from his appropriation of the initial payment are subject to plaintiff's compensatory damages claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Judges McCULLOUGH and DIETZ concur.

The trial court also granted plaintiff's motion for a directed verdict on defendant's counterclaims, since he neither prosecuted nor presented evidence upon them.

Although Delaware law is not binding on this Court, we find its well-developed body of corporate case law instructive and persuasive.

"The business judgment rule is generally stated, by [our Supreme Court] and others, as being available to officer and directors." Robinson at § 16.07 (citing Alford v. Shaw, 318 N.C. 289, 299, 349 S.E.2d 41, 47 (1986), on reh'g, 320 N.C. 465, 358 S.E.2d 323 (1987) (stating in dicta that the "rule has provided the yardstick against which the duties and decisions of corporate officers and directors are measured")).

"The case law interpreting [section] 6672 generally refers to the person required to collect, account for, and remit payroll taxes to the United States as the 'responsible person.' " Plett v. United States, 185 F.3d 216, 218-19 (4th Cir.1999).

As noted below, we conclude that the reasonable reliance requirement of fraud was obviated in this case due to defendant's concealment of the August Contract. However, GEI also detrimentally relied on defendant's affirmative misrepresentation as to the July Contract, which fraudulently induced the Board to forego inquiries which it otherwise would have made. Thus, no matter what analysis is applied, the trial court reached an erroneous conclusion on plaintiff's fraud claim.

Plaintiff makes no legal argument on its resulting trust claim, and we believe the claim was never actionable in the first place. See Patterson v. Strickland, 133 N.C.App. 510, 519, 515 S.E.2d 915, 920 (1999) (explaining that a resulting trust generally arises "when a person becomes invested with the title to real property under circumstances which in equity obligate him to hold the title and to exercise his ownership for the benefit of another") (citation and quotation marks omitted). Accordingly, we will not address this issue. See N.C.R.App. P. 28(b)(6).