Fogartie v. Edrington, 2017 NCBC 104.

STATE OF NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 12698

JAMES E. FOGARTIE, JR. and
STEVEN KAGAN, individually
and derivatively on behalf of
Carolina Vascular Surgery and
Diagnostics, P.A.,

Plaintiffs,

v.

R. DAVID EDRINGTON,
GEORGE T. CLARK III,
CHRISTOPHER R. LONGO,

Defendants,

and

CAROLINA VASCULAR
SURGERY AND DIAGNOSTICS,
P.A.

Nominal
Defendant.

**ORDER ON PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

THIS MATTER comes before the Court upon Plaintiffs' Motion for Preliminary Injunction (the "Motion"). (ECF No. 5.)

THE COURT, having considered the Motion, the briefs in support of and in opposition to the Motion, the arguments of counsel at the hearing, the record evidence filed by the parties, and other appropriate matters of record, FINDS and CONCLUDES, in its discretion, that the Motion should be DENIED for the reasons set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND

1. The Court finds facts solely for purposes of deciding the Motion, and such findings are not binding in any subsequent proceedings. *Daimlerchrysler Corp. v. Kirkhart,* 148 N.C. App. 572, 578, 561 S.E.2d 276, 282 (2002).

2. Plaintiffs James E. Fogartie, Jr. ("Fogartie") and Steven Kagan ("Kagan") (Fogartie and Kagan are referred to collectively as "Plaintiffs") and Defendants R. David Edrington ("Edrington"), George T. Clark III ("Clark"), and Christopher R. Longo ("Longo") (Edrington, Clark, and Longo are referred to collectively as "Defendants") are vascular surgeons (collectively, Plaintiffs and Defendants are referred to as "the five surgeons"). The five surgeons are the only shareholders of Nominal Defendant Carolina Vascular Surgery and Diagnostics, P.A. ("CVSD"), a North Carolina professional corporation formed in 2002. The five surgeons each own 20% of CVSD's common stock, and each are directors on CVSD's Board of Directors. (Verified Complaint, ECF No. 3 at ¶¶ 13–14.) The five surgeons also are employed by CVSD. (ECF No. 3 at ¶ 12.)

3. CVSD is a vascular surgery practice located in Raleigh. (ECF No. 3 at ¶ 11.) In addition to the five surgeons, CVSD employs between 15 and 20 full-time and part-time employees. (ECF No. 3 at ¶ 19.)

4. CVSD adopted corporate By-Laws ("By-Laws") that provide for governance by simple majority vote. (CVSD By-Laws, ECF No. 21.2.) The By-Laws further provide that: "the business and affairs of [CVSD] shall be managed by the

Board of Directors" (*Id*. at Art. III, § 1); "a majority of the Directors … shall constitute a quorum for the transaction of business" (*Id*. at Art. III, § 4); and "the act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors." (*Id*. at Art. III, § 5.) The holders of the majority of CVSD shares constitute a quorum for purposes of shareholder action, and shareholder action requires a vote of the majority of the shares present in a quorum. (*Id*. at Art. II, § 7.) Directors may only be removed by "a vote of shareholders holding a majority of the share entitled to vote . . . ." (*Id*. At Art. III, § 4.)

5. On February 9, 2009, the five surgeons entered into the Shareholders' Buy-Sell Agreement. (ECF No. 3, at Ex. R; the "Buy-Sell Agreement.") Under the Buy-Sell Agreement, if a Shareholder transfers their stock ownership for any reason, "the Net Purchase Price for the shares of Common Stock owned by the Shareholder shall be determined in the discretion of the … Board of Directors" using one or more of more suggested methods for valuing the corporation. (ECF No. 3, at Ex. R § 1.11.1.)

6. CVSD's revenue has declined in recent years due to a variety of factors. As a result the five surgeons explored relationships with other medical providers in pursuit of an alternate business model. (Kagan Aff., ECF No. 6.2 at ¶¶ 4–5; Edrington Aff., ECF No. 15.2 at ¶¶ 3, 7–8, 10–14; Clark Aff., ECF No. 15.3 at ¶¶ 4, 6–7; Longo Aff., ECF No. 15.4 at ¶¶ 4, 6–8.) On October 26, 2016, the five surgeons met with Duke University Health System, Inc. ("Duke") to discuss potential options for a business relationship. (ECF No. 6.2 at ¶ 5.)

7. On or about July 6, 2017, Duke made offers of employment to each of the five CVSD physicians. (*Id.*)

8. The five surgeons also held meetings with WakeMed Physicians Practice/WakeMed Health and Hospitals ("WakeMed"). (Nathan Aff., ECF No. 6.3 at ¶¶ 2–4; ECF No. 15.2 at ¶¶ 11–12.) The five surgeons met with WakeMed on July 20, 2017, and advised WakeMed that they were interested in receiving proposals for a business relationship with WakeMed. (ECF No. 15.2 at ¶¶ 12–13; ECF No. 15.3 at ¶ 18; ECF No. 15.4 at ¶¶ 11–14.)

9. On July 25, 2017, prior to receiving a proposal from WakeMed, Defendants notified Plaintiffs that they had accepted Duke's offers of employment. (ECF No. 15.2 at ¶ 17; ECF No. 15.3 at ¶ 25; ECF No. 15.4 at ¶ 17.) Plaintiffs did not accept the offers of employment from Duke. Instead, Plaintiffs "intend to continue practicing at CVSD . . . and they have told Defendants of those intentions." (ECF No. 3 at ¶ 23.)

10. Plaintiffs allege that Defendants intend to open their new Duke-affiliated office less than one-half mile from CVSD's office in April of 2018, and that Defendants' practice will directly compete with CVSD for patients. (ECF No. 3 at ¶¶ 21–22.)

11. After Defendants accepted employment with Duke, WakeMed ceased discussions with Plaintiffs regarding the potential business relationship. (ECF No. 6.3 at ¶ 5; ECF No. 3 at ¶ 67.) WakeMed will not resume negotiations with CVSD until "it has assurance that the people involved in any negotiations have authority to

speak and act for CVSD," and "until assured that the terms of any proposed arrangement will be held confidentially by such members and acted upon in the best interest of any WakeMed and CVSD arrangement." (ECF No. 6.3 at ¶¶ 6–7.)

12. In the weeks following Defendants' commitment to enter into employment with Duke, the atmosphere at CVSD became tense. (ECF No. 15.2 at ¶ 25.) In August 2017, Edrington sent emails to Clark and Longo stating, *inter alia*:

> I've been reading our buy sell agreement. Thankfully it is explicit.
>
>  . . .
>
> It is therefore imperative to drive up the price of the stock to make it somewhat painful. I don't expect to be paid until the very last day of the contract requirement but it might still be painful to come up with say $300,000 to pay out, especially when at the same time [Fogartie] will be approaching his exit and he will most certainly want the same deal we got!  Can't wait to see how [Kagan] deals with that!

and,

> I have now looked at both the Buy Sell and Bylaws and I see no wiggle room.
>
> The three of us can meet as a quorum with or without [Plaintiffs].  At that meeting we can set the stock price to include three months (*sic*) salary, goodwill and a proportion of the corporation assets. We can elect to have these amounts given to us in cash on the day we surrender our stock.

(ECF No. 3 at ¶¶ 59–60; Ex. S.)

13. The evidence, however, shows that despite Edrington's statements to Clark and Longo in the emails, he attempted to bring about an agreement between

Defendants and Plaintiffs regarding an appropriate method for implementing the Buy-Sell Agreement, including proposing that Plaintiffs and Defendants each retain attorneys to work out details of a buyout of Defendants' interests in CVSD. (ECF No. 15.2 at ¶¶ 29–36, Exs. B and C.) The parties subsequently retained attorneys and had preliminary discussions regarding resolution of their disagreements. (*Id.* at ¶¶ 35–36, Ex. C.) Apparently, these discussions ceased.

14.    Currently, Defendants Edrington, Clark, and Longo are still employed with CVSD, and remain shareholders and directors of CVSD. (ECF No. 3 at ¶ 24.) Plaintiffs allege that, as three of the five directors and a majority of the shareholders, Defendants "collectively control CVSD." (*Id.* at ¶ 52.) Plaintiffs further contend that Defendants' "loyalties now lie with Duke," but "Defendants have refused to relinquish their collective control of CVSD." (*Id.* at ¶ 53.) Plaintiffs allege that Defendants "each began working on Duke's behalf in direct competition with CVSD while still serving as directors of CVSD," (*Id.* at ¶ 27) by taking the following actions:

a. In August 2017, Longo communicated with Duke to facilitate entry into a training agreement that would allow the Defendants to train Duke fellows after Defendants entered employment with Duke. (*Id.* at ¶ 28.)

b. Clark provided Duke with a list of equipment used in CVSD's angiography suite. (*Id.* at ¶ 30.)

c. On September 14, 2017, Defendants interviewed a candidate for a position in Duke's division of vascular surgery, Dr. Joe Salfity[1], even though CVSD was also recruiting Dr. Salfity. Edrington told Duke that CVSD was recruiting Dr. Salfity and would likely offer him a contract. In an email to Dr. Salfity after the interview, Edrington did not encourage Dr. Salfity to join CVSD, but instead encouraged Dr. Salfity to "try to work out a position with WakeMed." (*Id.* at ¶¶ 31–33; Ex. G.)

d. In September 2017, Edrington facilitated communication between a part-time CVSD employee, Catherine Morgan ("Morgan"), and Duke, for the purpose of discussing "future employment opportunities" with Duke. (ECF No. 3 at ¶¶ 34–37.) Edrington also communicated with Duke emphasizing Morgan's value as an employee, and suggested that Duke rely on her knowledge "regarding the steps necessary to open the new vascular practice." (*Id.* at ¶¶ 36, 38–40.) Upon learning of Edrington's attempt to recruit Morgan to Duke, CVSD offered Morgan full-time employment on October 9, 2017, but Morgan tendered a letter of resignation the following day. (*Id.* at ¶ 50.) Morgan subsequently reconsidered, and she remains employed with CVSD at this time. (ECF No. 15.2 at ¶ 66; ECF No. 6.2 at ¶ 15.)

---

[1] (ECF No. 3, at Ex. D.)

e. Defendants participated in a meeting with Duke to discuss Duke's proposed equipment list for the new office, the proposed layout of the new office, a list of procedures to be performed at the new office, and a "staffing plan." (*Id.* at ¶ 41.)

f. On September 26, 2017, Clark sent an email to Duke listing first names and job titles of current CVSD employees to demonstrate the "types of employees that will be needed to establish Defendants' new office with Duke." (*Id.* at ¶ 42.)

g. Edrington utilized Morgan's knowledge to obtain an application form and vendor quote for equipment necessary to open Duke's new office. (*Id.* at ¶ 44.)

15. Plaintiffs discovered Defendants' conduct in late September 2017, and "requested that Defendants resign from CVSD, but Defendants refused." (ECF No. 3 at ¶¶ 45–46.) On September 28, 2017, Plaintiffs' counsel sent Defendants a letter demanding that Defendants cease engaging in "competitive activities" on behalf of Duke, including:

> (a) interviewing or otherwise meeting with Duke's candidates for its vascular surgery practice . . . (b) soliciting Catherine Morgan and other CVSD employee's [*sic*] on Duke's behalf, (c) encouraging CVSD's employees to seek other employment, (d) providing information to Duke regarding CVSD's employees, equipment, or operations, (e) communicating with Duke regarding its administrative, operational or logistical needs for your vascular surgery practice, and (f) disparaging CVSD's doctors or its ongoing viability as a medical practice.

(*Id.* at Ex. N.) The letter suggested that, in the alternative, Defendants should resign their positions as directors of CVSD. (*Id.*)

16.     On October 6, 2017, counsel for Defendants responded to the letter. (ECF No. 3, at Ex. P.) Defendants denied that their conduct was in breach of their duties to CVSD or otherwise unlawful in any way.  Nevertheless, "in the interest of keeping the peace during the time the doctors will continue to work together," Defendants agreed to the following restrictions on their conduct:

> (1) [Defendants] will not meet with or interview candidates for Duke's vascular surgery practice[.] . . . (2) They will not solicit Catherine Morgan or any other CVSD employee on Duke's behalf. In addition, if Doctors Kagan and Fogartie request them to do so, they will agree not to offer employment to Ms. Morgan until 180 days after their last day at CVSD. (3) They will not encourage CVSD's employees to seek other employment. (4) They will not provide information to Duke regarding CVSD's employees, equipment, or operations. (5) They will not disparage CVSD's doctors or its ongoing viability as a surgical practice.

(*Id.*)

17.     To date, the parties have not reached any agreement regarding Defendants' ongoing exercise of their powers as directors of CVSD.

18.     On September 28, 2017, Plaintiffs' counsel also sent a request to CVSD, pursuant to N.C. Gen. Stat. § 55-7-42 (hereinafter, references to the North Carolina General Statutes will be to "G.S."), to take action on behalf of CVSD against Defendants regarding their alleged breaches of duties. (*Id.* at ¶ 48, Ex. O.)

19.    Plaintiffs filed the Verified Complaint on October 18, 2017. The Verified Complaint alleges individual claims and derivative claims on behalf of CVSD against Defendants. Plaintiffs make individual and derivative claims for removal of directors pursuant to G.S. § 55-8-09 and for breach of fiduciary duty, derivative claims for constructive fraud and unfair and deceptive trade practices, and an individual claim for declaratory judgment. The Verified Complaint seeks, among other relief, a preliminary injunction:

> (a) prohibiting Defendants from working for Duke, providing Duke any information relating to CVSD, or otherwise assisting Duke in any manner while they are directors of CVSD; (b) prohibiting Defendants from soliciting or recruiting any CVSD employees or former employees while Defendants are directors of CVSD; (c) prohibiting Defendants from taking any action in contravention of their fiduciary duties to CVSD and Plaintiffs; (d) prohibiting Defendants from taking any action in their capacities as members of CVSD's board of directors; and (e) prohibiting Defendants from participating in, attempting to hinder, or receiving information concerning CVSD's strategic and operational decision-making regarding its future, including without limitation the hiring and management of employees, the management of CVSD's finances and the negotiation and execution of contracts.

(ECF No. 3 at p. 24.)

20.    On October 24, 2017, Plaintiffs filed their Motion for Preliminary Injunction, and a Brief in Support of their Motion for Preliminary Injunction. (ECF No. 6.) On November 3, 2017, Defendants filed their Brief in Response to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 15.) Also on November 3, 2017, CVSD filed a Brief in Response to Plaintiffs' Motion for Preliminary Injunction. (ECF No.

14.) On November 6, 2017, Plaintiffs filed their Reply Brief in Support of their Motion for Preliminary Injunction. (ECF No. 16.)

21. On November 7, 2017, the Court held a hearing on the Motion. The Motion is now ripe for disposition.

## ANALYSIS

*A. Standard of Review*

22. A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render judgment ineffectual." G.S. § 1-485(2). A preliminary injunction is "an extraordinary remedy and will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976). The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975). To obtain a preliminary injunction a movant must show "a likelihood of success on the merits of [the] case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [the movant's] rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003); *accord Looney v. Wilson*, 97 N.C. App. 304, 307–08, 388 S.E.2d 142, 144–45 (1990). Likelihood of

success means "a reasonable likelihood." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d 754, 761 (1983).

23.    Additionally, the Court must balance the equities, and a preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending the final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. Of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968); *accord Cty. Of Johnston v. City of Wilson*, 136 N.C. App. 775, 780, 525 S.E.2d 826, 829 (2000) (noting that a court should weigh "the advantages and disadvantages to the parties" in deciding whether to issue a preliminary injunction).

24.    The issuance of an injunction is "a matter of discretion to be exercised by the hearing judge after a careful balance of the equities." *State ex. Rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980).

   B.    *Likelihood of Success on the Merits*

25.    In support of the Motion, Plaintiffs have argued only the merits of their claims for breach of fiduciary duty and for removal of Defendants as directors under G.S. § 55-8-09. Accordingly, the Court will address only those claims in determining the likelihood of success on the merits.

   i.   Breach of Fiduciary Duty

26.    Under North Carolina law, corporate directors owe fiduciary duties to the corporation, and must discharge their duties "(1) [i]n good faith; (2) [w]ith the

care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner [the director] reasonably believes to be in the best interest of the corporation." G.S. § 55-8-30(a); *accord Seraph Garrison, LLC v. Garrison*, 787 S.E.2d 398, 2016 N.C. App. LEXIS 384, at *8 (N.C. Ct. App. Apr. 19, 2016) ("[A]n officer [must] always discharge the responsibilities of the office with undivided loyalty to the corporation." (internal quotation marks omitted)). "[T]he analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which [the officer] serves the corporation." *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC 44, at *32 (N.C. Super. Ct. June 20, 2016) (quoting *Seraph Garrison, LLC*, 2016 N.C. App. LEXIS 384, at *10) (internal quotation marks omitted).

27. There is case law in North Carolina that has held that "merely making plans to compete with an employer before leaving the company, without more, does not necessarily constitute a breach of fiduciary duty." *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *84 (N.C. Super. Ct. Feb. 18, 2016) (citing *Fletcher, Barnhardt & White, Inc. v. Matthews*, 100 N.C. App. 436, 441–42, 397 S.E.2d 81, 84 (1990)); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at *25–26 (N.C. Super. Ct. July 10, 2002). In those cases, the courts have held that the crucial question is whether the individual took improper actions in furtherance of a plan to compete, or was only engaged in the planning to compete in the future. *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at *84; *Sunbelt Rentals, Inc.*, 2002 NCBC LEXIS 2, at *25. While these decisions have recognized that preparation

activities that resulted in breach of a covenant not to compete, or misappropriation of the plaintiff's trade secrets, could constitute activities breaching a fiduciary duty, *id.*; *Fletcher, Barnhardt & White, Inc.*, 100 N.C. App. at 441–42, 397 S.E.2d at 84, they do not clearly delineate where the line between lawful and unlawful planning and preparation activities lies.[2]

28.     Both Plaintiffs and Defendants contend that the holdings in these cases support their respective positions.  Plaintiffs claim that "Defendants' conduct has transcended mere preparations; they have taken concrete actions for Duke's benefit at the present expense of CVSD." (ECF No. 6 at p. 12.) Plaintiffs argue that Defendants "are *currently* competing with CVSD in their recruiting and operational work for Duke" and have "us[ed] CVSD's proprietary information to assist Duke in establishing a new vascular surgery office to compete with CVSD." (*Id.* at pp. 12–13.) Defendants, on the other hand, argue that "[o]nly when the director 'actually compet[es]' with the corporation is he in violation of his fiduciary duty." (ECF No. 15 at p. 6, citing *Dalton v. Camp*, 138 N.C. App. 201, 207, 531 S.E.2d 258, 263 (2000), *rev'd on other grounds*, 353 N.C. 647, 548 S.E.2d 704 (2001).)

---

[2] In *Roundpoint Mortg. Co., Inc.*, the Court cited with approval *Maryland Metals, Inc. v. Metzner,* 382 A.2d 564, 568-70 (Md. Ct. App. 1978), summarizing that case as holding that "the right of an employee to make arrangements to compete is defeated by misconduct such as misappropriation of trade secrets, misuse of confidential information, solicitation of an employer's customers prior to cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, and usurpation of [the] employer's business opportunity."

29. As a preliminary matter, the Court notes that the Defendants did not have agreements not to compete with CVSD, and, at the hearing, Plaintiffs' counsel conceded that the information that Defendants provided to Duke regarding CVSD's operation, equipment, and employees are not "trade secrets" within the meaning of the North Carolina Trade Secrets Protection Act, G.S. §§ 66-154 *et seq*. Accordingly, these two recognized types of activities that might constitute breaches of fiduciary duty are not present in this action.

30. In addition, the Court concludes that Defendants' activities here did not constitute actual competition with CVSD. There is no evidence that Defendants have steered current CVSD patients to seek care from Duke, or that they have performed medical services for Duke. Nor is there evidence that Defendants have usurped, for Duke, any corporate opportunities rightfully belonging to CVSD.

31. The Court also concludes that, despite Plaintiffs' characterizations, the information that Defendants provided to Duke about CVSD's current practice and employees was not confidential "proprietary" information. The evidence establishes that CVSD made no attempts to maintain the confidentiality of the names or job titles of its staff, the types or brands of the equipment it used, or the layout of its office and treatment facilities. In fact, much of that information, including a list of procedures to be performed in the office, a list of equipment in the angiography suite, a photograph depicting the layout of the angiography suite, and a list of employee names and job titles, is available on CVSD's public website. (Clark Aff. II, ECF No. 17, at Exs. A and B.) To the extent that some of the information provided to Duke by

Defendants was not available to the public on the website, the information was neither proprietary nor confidential.

32.     The question then becomes whether Defendants' other activities in providing information and assistance to Duke to set up their office and practice with Duke crossed the line into unlawful preparation to compete. The interview of Dr. Salfity and the alleged recruitment of Catherine Morgan are closer to the line between mere preparation to compete and actual competition.

33.     Plaintiffs contend that Defendants breached their fiduciary duties of loyalty by interviewing Dr. Salfity on Duke's behalf while CVSD was also recruiting him, by informing Duke that CVSD was recruiting Dr. Salfity, and by allegedly encouraging Dr. Salfity to refrain from joining CVSD.[3] (ECF No. 6 at pp. 11–12.) Defendants submitted affidavits in response stating that Duke asked them to "meet with" Dr. Salfity as a professional courtesy because Dr. Salfity's wife had recently accepted a three-year position as a cardiothoracic fellow at Duke. (ECF No. 15.2 at ¶¶ 71–76.) Duke was not interested in hiring Dr. Salfity for a position in Raleigh and, in fact, Duke did not offer Dr. Salfity a position. (*Id.* at ¶¶ 71 and 80.) Edrington, however, knew that Dr. Salfity was being interviewed by Fogartie and Kagan on behalf of CVSD, and communicated that information to Duke. (ECF No. 3, at Ex. F.)

---

[3] Plaintiffs characterized Edrington's email to Dr. Salfity as "discourag[ing] [Dr. Salfity] from joining CVSD." (ECF No. 3 at ¶ 33.) The actual text of the email does not reference CVSD or discourage Dr. Salfity in any way. (ECF No. 3, at Ex. G.) Instead, the email encourages Dr. Salfity to accept a position with WakeMed if one is offered. (*Id.*) As such, the best characterization of Edrington's email is that he did not actively encourage Dr. Salfity to join CVSD.

Edrington encouraged Dr. Salfity to take a position with WakeMed, should it be offered, as it "would be the next best opportunity" to a position with Duke. (ECF No. 3, at Ex. G.)

34.    In light of the circumstances surrounding Defendants' interview of Dr. Salfity, the Court concludes that Plaintiffs have failed at this time to establish a likelihood of success on its claim that the conduct breached Defendants' fiduciary duties to CVSD. *See RCJJ, LLC*, 2016 NCBC LEXIS 46, at *22–24 ("[T]he analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which he serves the corporation."). The unrebutted evidence is that the meeting between Defendants and Dr. Salfity was more of a general discussion of potential opportunities in the vascular surgery field in the triangle area, and not an "interview." It also is unrebutted that Duke had no interest in hiring Dr. Salfity in Raleigh.

35.    The emails from Edrington to Duke and Dr. Salfity following the interview are a different matter. Edrington had "an affirmative obligation . . . to advance the best interests of the corporation," *RCJJ, LLC*, 2016 NCBC LEXIS 46, at *24. Informing Duke, a competitor of CVSD, about CVSD's recruitment efforts and encouraging Dr. Salfity to accept a position with WakeMed while aware that CVSD also had interest in employing him (and a pressing need for new vascular surgeons) does not demonstrate the "utmost devotion" to CVSD. *Id.*

36.    Even if the Court assumes, however, that Edrington breached his fiduciary duty, "[c]laims for breach of fiduciary duty…require proof of an injury or

harm proximately caused by the breach of duty." *BDM Investments v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *29–30 (N.C. Super. Ct. Mar. 20, 2014) (citing *Jay Grp., Ltd. v. Glasgow*, 139 N.C. App. 595, 600–01, 534 S.E.2d 233, 237 (2000)); *Progress Point One-B Condo. Ass'n, Inc. v. Progress Point One Prop. Owners Ass'n*, 2015 NCBC LEXIS 22, at *10 (N.C. Super. Ct. Mar. 2, 2015); *see also, Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) ("The first issue before us is whether there was sufficient evidence, as a matter of law, that [defendant] breached a fiduciary duty owed to plaintiffs, proximately causing injury to them."). Plaintiffs have not alleged that CVSD made an offer of employment to Dr. Salfity, much less that he rejected an offer of employment. Without any allegation that Edrington's emails with Duke and Dr. Salfity proximately caused harm to CVSD, there is not a likelihood of success on the claim for breach of fiduciary duty based on the email.

37. Defendants' alleged recruitment of Morgan is also close to the line between permissible action and a breach of fiduciary duty. Edrington told Duke that Morgan was a "key employee" upon whom CVSD relied "to set up [CVSD's] practice model." (ECF No. 3, at Ex. H.) Additionally, Edrington commented that Morgan "would be hard to replace." (*Id.*) Edrington encouraged Duke to recruit Morgan for Duke's Raleigh office. (*Id.*) He also encouraged Duke to rely on Morgan's knowledge of CVSD's business practice to develop Duke's new office layout and facilitate the purchase of necessary equipment. (ECF No. 3, at Exs. I, M.)

38. Defendants contend that it was Morgan who approached Edrington and Longo to express her desire for full-time employment and her dissatisfaction with

CVSD, and Plaintiffs in particular. (ECF No. 15.2 at ¶¶ 53–62.) Edrington claims that he sent the emails to Duke with the intention of "helping a deserving person get a job." (*Id.* at ¶¶ 64–65.) Edrington "believed [Morgan] would leave CVSD as soon as she found a suitable full-time position." (ECF No. 15.2 at ¶ 66.) Morgan tendered her resignation to CVSD in October 2017, but reconsidered and remains employed with CVSD at this time.

39.     It is questionable whether Edrington's attempt to get Duke to hire Morgan away from CVSD demonstrates the "utmost devotion" to CVSD required by his fiduciary duties. *See, RCJJ, LLC*, 2016 NCBC LEXIS 46, at *24. Again, however, Plaintiffs have not provided "proof of an injury or harm proximately caused by the breach of duty." *BDM Investments*, 2014 NCBC LEXIS 6, at *29–30. Plaintiffs have provided evidence that CVSD is interviewing candidates for Morgan's position, believing that Morgan's continued employment with CVSD is precarious, (ECF No. 6.2 at ¶ 15), but Morgan remains employed by CVSD. In addition, Defendants have agreed to "not solicit Catherine Morgan or any other CVSD employee on Duke's behalf . . . [and] agree[d] not to offer employment to Ms. Morgan until 180 days after their last day at CVSD." (ECF No. 3, at Ex. P.) Plaintiffs have not established a likelihood of success on their breach of fiduciary duty claims arising from Defendants' recruiting of Morgan.

40.     In summary, the evidence at this stage of the proceeding does not establish that Defendants' activities amounted to improper preparations to compete, and Plaintiffs have not shown they are likely to succeed on their claims that

Defendants breached fiduciary duties. Plaintiffs' request for a preliminary injunction based on Defendants' alleged breaches of fiduciary duties should be DENIED.

### ii. Removal of Directors

41.     Plaintiffs seek removal of Defendants as directors of CVSD under G.S. § 55-8-09, which provides:

> The superior court of the county where a corporation's principal office . . . is located may remove a director of the corporation from office in a proceeding commenced either by the corporation or by its shareholders holding at least ten percent (10%) of the outstanding shares of any class if the court finds that: (1) the director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation; and (2) removal is in the best interest of the corporation.

42.     Plaintiffs argue that removal is proper because the same actions alleged to be breaches of Defendants' fiduciary duties also constitute dishonest conduct and gross abuse of authority and discretion.[4] (ECF No. 6 at p. 15.) For the same reasons that the Court concluded that Plaintiff has not established a likelihood of success on their breach of fiduciary duty claims, the Court concludes that Plaintiffs have not shown that they are likely to succeed on their claims that Defendants acted dishonestly or grossly abused their authority as directors. Accordingly, the Court will not exercise its authority under G.S. § 55-8-09 at this stage of the litigation based on that conduct.

---

[4] At the hearing, Plaintiffs conceded that Defendants have not engaged in fraudulent conduct.

43. Plaintiffs also argue that Defendants should be removed as directors because they have stated that they intend to use their majority control of CVSD's Board of Directors to "drive up" the Net Purchase Price of their shares under the Buy-Sell Agreement when Defendants leave the corporation. (*Id.* at pp. 15–16.) The parties have not, however, actually set the Net Purchase Price for Defendants' shares in CVSD at this time, and it appears that the valuation process won't take place until sometime in the spring of 2018 at the earliest. Defendants have not yet engaged in any improper conduct related to the valuation of shares in CVSD.

44. In conclusion, Plaintiffs have not sufficiently provided evidence establishing a likelihood of success on the merits for the claims of breach of fiduciary duty or removal of directors under G.S. § 55-8-09 to justify imposition of a preliminary injunction at this time. Plaintiffs' request for a preliminary injunction seeking removal of Defendants as directors pursuant to G.S. § 55-8-09 should be DENIED.

C. *Irreparable Harm*

45. Having determined that Plaintiffs have failed to establish a likelihood of success on the merits, the Court need not reach the question of whether Plaintiffs will suffer irreparable harm.

D. *Balancing of Equities*

46. Finally, the Court must consider the balance of equities. When balancing the equities, the Court should not grant a preliminary injunction "where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending the final determination of the matter,

would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968).

47. Plaintiffs contend that, "absent intervention from the Court" to remove Defendants as directors, "CVSD's fate is certain death." (ECF No. 6 at p. 22.) Plaintiffs argue that Defendants must be removed in order to allow Plaintiffs to act as the Board of the Directors on behalf of CVSD. (*Id.* at pp. 20–22.) Plaintiffs point out that WakeMed is unwilling to negotiate with them over a potential relationship while Defendants remain in control of CVSD. This problem, however, is the result of WakeMed's apparent confidentiality and other business concerns, and not any breach of Defendants' duties to CVSD.

48. Plaintiffs also contend that Plaintiffs must take control of the Board of Directors in order to permit CVSD to hire new vascular surgeons and to permit CVSD to hire a replacement for Morgan, should she leave, (*Id.* at pp. 20–21), but Plaintiffs have not provided evidence that Defendants have blocked or impeded CVSD's attempts to hire new physicians or staff. To the contrary, Defendants have introduced evidence that they have at least expressed the willingness to work cooperatively with Plaintiffs towards a resolution of the current dispute that would permit Plaintiffs to pursue their interests in continuing to practice as CVSD. (ECF No. 15.2 at ¶¶ 37–52; Exs. D–F.) While the devil would certainly lie in the details of any such resolution, it appears from the evidence that Plaintiffs have not been as willing as Defendants to explore a potential for resolution.

49. Defendants, on the other hand, argue that placing Plaintiffs in control as the sole directors of CVSD would expose them to the same potential issues Plaintiff claim they now face regarding determination of the Net Purchase Price of their shares. (ECF No. at pp. 20–22.) Defendants contend that they too are entitled to a say in CVSD's affairs during their final months with the practice, and entitled to exercise their rights as shareholders and directors. (*Id*.)

50. The record evidence makes it clear that five surgeons all have contributed to the success of, and have a substantial interest in, CVSD, both professionally and financially. In this case the five surgeons agreed that CVSD would act through majority vote of the directors. Defendants constitute the majority of the Board of Directors. Plaintiffs are understandably unhappy with this arrangement now that Defendants have decided to practice with Duke. Nevertheless, since Plaintiffs have not established that Defendants have caused or will cause injury to CVSD through conduct in breach of their duties to the corporation, the extraordinary remedy of an injunction is not warranted.

## CONCLUSION

51. In conclusion, because Plaintiffs have failed to establish a likelihood of success on the merits, and because the equities in this particular case weigh against imposition of an injunction, Plaintiffs' Motion for Preliminary Injunction is DENIED.

THEREFORE, IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction is DENIED.

This, the 17th day of November, 2017.

                                  /s/ Gregory P. McGuire
                                  Gregory P. McGuire
                                  Special Superior Court Judge
                                  for Complex Business Cases