Albritton v. Albritton Prop. Assocs., Ltd. P'ship, 2021 NCBC 34.

STATE OF NORTH CAROLINA
GREENE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 47

CHARLES BRADFORD
ALBRITTON and RYAN
BATCHELOR ALBRITTON, CO-
EXECUTORS OF THE ESTATE OF
CHARLES HOPKINS ALBRITTON,
III,

Plaintiffs,

v.

ALBRITTON PROPERTY
ASSOCIATES, LIMITED
PARTNERSHIP; BILLE J.
ALBRITTON; WILLIAM DAVID
ALBRITTON; and DEBORAH A.
KATKAVECK,

Defendants.

TAG, INC., CARE CENTER OF
TENNESSEE, INC., THE
ALBRITTON COMPANY, INC. and
EASTERN RETIREMENT
CENTERS, INC.

Additional Defendants,

v.

WILLIAM DAVID ALBRITTON,
DEBORAH A. KATKAVECK, and
ALBRITTON REALTY GROUP,
L.L.C.,

Cross-Claim Defendants.

**ORDER AND OPINION ON BILLE AND BILLE ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO (I) CLAIMS BY BILLE AND BILLE ENTITIES AGAINST DAVID, DEBORAH, AND ARG AND (II) CERTAIN AFFIRMATIVE DEFENSES RAISED BY DAVID, DEBORAH, AND ARG**

THIS MATTER comes before the Court on Defendants Bille J. Albritton ("Bille"), Care Center of Tennessee, Inc. ("Care Center"), The Albritton Company, Inc. ("TAC"), and Eastern Retirement Centers, Inc.'s ("ERC") (collectively referred to as the "Movants") Motion for Partial Summary Judgment as to (I) Claims by Bille and

Bille Entities[1] against William David Albritton ("David"), Deborah A. Katkaveck ("Deborah"), and Albritton Realty Group, L.L.C. ("ARG"), and (II) Certain Affirmative Defenses of David, Deborah, and ARG. ("Motion," ECF No. 129.) Movants filed evidentiary materials in support of the Motion ("Movants' Evidence," ECF No. 130.1–.33), and a Memorandum in Support of the Motion ("Mem. in Supp.," ECF No. 131). David, Deborah, and ARG[2] (collectively, for purposes of deciding this Motion, these parties are referred to as "Defendants") filed a Response in Opposition to the motion for summary judgment ("Response in Opposition," ECF No. 140), and certain evidentiary materials in opposition to the Motion. ("Defendants' Evidence," ECF No. 140.1–.3.) Movants subsequently filed a reply in support of the Motion. (ECF No. 148.)

THE COURT has thoroughly reviewed the Motion, Movants' Evidence, Defendants' Evidence, the briefs in support of and in opposition to the Motion, the applicable law, and other appropriate matters of record and CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, as set forth below.

I.    INTRODUCTION

1.    This case arises out of disputes between Bille and her children, David and Deborah, over the operations and management of Defendant Albritton Property

---

[1] Collectively, Movants and Defendant Tag, Inc. ("Tag") are referred to as the "Bille Entities." However, Bille and the Bille Entities represent that they do not seek summary judgment as to any claims involving Tag.

[2] ARG is a North Carolina limited liability company organized on or about October 1998. ARG is owned by its member managers, David and Deborah. (ECF No. 38, at ¶ 13.)

Associates Limited Partnership ("APALP") and the Bille Entities. Bille, David, and Deborah are partners in APALP. APALP has operated Care Center, TAC, ERC, and Tag since the mid-1990s.

2. From 1996 until October 2018, Bille, David, Deborah, and Bille's deceased son, Charles Bradford Albritton ("Charles"), acted as a management board for APALP. However, in or around 2004, Bille turned over the day-to-day management of APALP to David, Deborah, and Charles, and then to David and Deborah after Charles passed away. Bille subsequently stopped attending meetings of the management board and became significantly less involved in APALP's operation of the Bille Entities. However, Bille, David, and Deborah sharply dispute whether, and when, Bille ceased active participation in the overall management of APALP and the Bille Entities. Movants claim that over a number of years up to and including 2018, and without her knowledge, David and Deborah breached their fiduciary duties to Bille and the Bille Entities by engaging in self-dealing and other mismanagement of the Bille Entities (the "Challenged Transactions") and by making a transfer of $700,000 from TAC to Charles's individually owned horse and saddle business (the "Saddle Transaction").

3. On the other hand, David and Deborah contend, variously: that Bille participated in or approved of some of the Challenged Transactions and the Saddle Transaction; that Bille ceded complete authority and autonomy to David and Deborah to manage the Bille Entities; and that Bille told David and Deborah that she did not want to be informed about the details of the companies' transactions because it was

a source of stress to her. David and Deborah also claim that it was Bille's intent, through the creation of APALP, to turn over ownership of the Bille Entities to David and Deborah, and that Bille was aware of and condoned the Challenged Transactions and the Saddle Transaction.

## II. FACTS

### A. Bille and the Bille Entities

4. Bille is over 90 years old. Bille is the mother of David, Deborah, and Charles. Charles passed away in January 2018.

5. It is undisputed that Bille is the 100% and sole owner of the Bille Entities. Since the 1990s, David has been the Chief Financial Officer and General Manager of the Care Center and ERC, the Chief Financial Officer of TAC, and the General Manager of Tag. (David Dep. (I), ECF No. 130.5, at pp. 12–13.) Deborah's roles in the Bille Entities are less well-defined, and she played a much more limited part in managing APALP and the Bille Entities than David. (ECF No. 103.4, *passim*.)

6. Bille was also the owner of three pieces of commercial real property: (i) the Belhaven Building, a commercial building which is rented to ERC; (ii) the Lowell Building, a commercial building which is rented to an independent operator; and (iii) the Hookerton Campus (collectively the "Three Properties"). (Verified Cross-Claim, ECF No. 11, at ¶¶ 16–17.)

## B. APALP

7. In 1996, Bille formed APALP and contributed the Three Properties to the partnership. (*Id.*) Since that time, APALP has been the owner of the Three Properties. (*Id.* at ¶ 17.)

8. On or around August 1, 1996, Bille, David, Deborah, and Charles entered into an Agreement of Limited Partnership for APALP ("Partnership Agreement"). (ECF No. 11, at ¶ 19; Partnership Agreement, ECF No. 1, at Ex. B, .pdf pp. 15–49.) Bille disputes the authenticity of the written Partnership Agreement currently in this Court's record, which was produced by David and Deborah during discovery. (EFC No. 11, at ¶ 21.) Nevertheless, the Partnership Agreement provides, in relevant part, as follows:

> "General Partners" mean BILLE J. ALBRITTON, WILLIAM DAVID ALBRITTON, CHARLES H. ALBRITTON, III, and DEBORAH A. KATKAVECK, and the persons who may be admitted to the Partnership as General Partners from time to time. The Partnership shall be managed by BILLE J. ALBRITTON during her lifetime or until she resigns or is unable or unwilling to serve (referred to hereinafter as the "Managing General Partner").
>
> When BILLE J. ALBRITTON is no longer serving as the Managing General Partner, the duties and obligations of the Managing General Partner shall be performed by the majority vote of the General Partners (with each General Partner having one vote), except as otherwise set forth in this Agreement.
>
> . . .
>
> When Bille J. Albritton is no longer serving as Managing General Partner, the General Partners may exercise all of the rights and powers of general partners as more

particularly provided in the Act and in this Agreement, except the rights and powers set forth below, which shall only be performed by General Partners with the unanimous consent of all Partners:

. . .

Without obtaining the consent of all of the General and Limited Partners, the Managing General Partner shall not do any act in contravention of the Act. The Managing General Partners, and all General Partners, shall manage the Partnership always keeping in mind their fiduciary duties to all partners.

(ECF No. 1, at Ex. B, .pdf pp. 17–18, 31–32.)

9. The Partnership Agreement contains the signatures of Bille, David, Deborah, and Charles as both "General Partners" and "Limited Partners." (ECF No. 1, at Ex. B, .pdf pp. 15–49.) Nevertheless, Movants insist "Bille is also the only General Partner [of APALP], owning a 1% general partnership interest, which is the only general partnership interest in [APALP]." (ECF No. 11, at ¶¶ 26–27.) David and Deborah dispute this claim and allege that they are also general partners of APALP. (Answer to Amended Cross-Claim, ECF No. 51, ¶¶ 34–40.) It is undisputed, however, that many corporate documents, including APALP's tax returns, list David and Deborah as limited, and not general, partners of APALP. (Deborah Dep., ECF No. 130.4, at pp. 55–59.)

10. It is undisputed that one of the reasons for forming APALP was to consolidate Albritton family assets, including the Three Properties and the Bille Entities, under one umbrella organization and to facilitate operation of the Bille Entities. (Bille Dep., ECF No. 140.2, at p. 17.) Bille testified that APALP was formed

so that David, Deborah, and Charles could "help run the [Bille Entities]." (ECF No. 140.2, at p. 17.)

11.    David contends that when APALP was formed the parties intended that Bille would transfer ownership in APALP and the Bille Entities to David, Deborah, and Charles through some type of tax-free "gifting" of Bille's ownership interests. (ECF No. 130.5 at pp. 16–17.)  David claims that there were efforts made, with the involvement of attorneys, to draft a written agreement for the transfer of Bille's ownership interests to her children, but that the parties were never able to reach an agreement. (*Id*. at pp. 17–19.)

## C.    Bille's Involvement in the Management of the Bille Entities and APALP

12.    In or about 2004, Bille turned over day-to-day management of the Bille Entities and APALP to David, Deborah, and Charles. (ECF No. 11, at p. 11, ¶ 40.) However, the parties differ as to what role Bille played in the management of the Bille Entities and APALP after she turned over day-to-day management, and what period she was actively involved in management.  The record evidence on these questions is conflicting and confusing.

13.    In 1996, Bille, David, Deborah, and Charles formed a management board to manage the Bille Entities. (ECF No. 140.1 at ¶¶ 3, 7; ECF No. 130.5, at pp. 14–15.)  The management board held monthly meetings. (ECF No. 140.1, at p. 45.) Bille claims she attended the monthly meetings for some period after 1996, but is "not sure" when she stopped attending the meetings. (*Id*.)  David states that Bille stopped attending the monthly meetings "in or around 2012." (ECF No. 130.1, at ¶ 8.)

Deborah testified that Bille stopped attending the monthly meetings "in the 1990s." (ECF No. 130.4, at pp. 42–43.)

14.     Bille's accountant, Lewis Jones ("Jones") testified in his deposition that he attended the monthly meetings, but that after 2001, Bille attended the board monthly meetings "sparingly." (L. Jones Dep., ECF No. 140.3, at p. 17.) When Bille did not attend the meetings, Jones would meet with her at her home or by telephone to summarize what had occurred at the meetings. (*Id*. at p. 18.) Jones' testimony regarding when he last attended the monthly meetings was contradictory. He first indicated he attended the monthly meetings up until 2018, but later claimed he last attended in or around 2010. (*Id*. at pp. 16, 39.)

15.     The parties also dispute when Bille stopped participating in making decisions for the Bille Entities. In her deposition, Bille claimed that she participated in major decisions until "the last few years." (ECF No. 140.2, at pp. 58–60.)

16.     David claims that he managed and ran APALP from 1996 until 2018, and that he also managed the Bille Entities from the "early 1990's" through 2018. (ECF No. 140.1, at ¶¶ 5–6; Dep. of Bille Albritton, ECF No. 107.2, at pp. 55–56.) David also contends that he made all financial decisions for the Bille Entities and APALP. (ECF No. 130.5, *passim*.) However, David's testimony regarding the role Deborah and Charles played in these decisions is confusing. David testified that he largely made financial decisions for the Bille Entities and APALP himself without consultation with Deborah and Charles (*Id*. at pp. 22, 25–26, 34–35, 37), but also claimed that he had "been managing the daily operations of the Partnership with the

knowledge and consent of all of the other partners since 1996" (ECF No. 140.1, at ¶ 5). David also claimed that he "never obtained approval [from Bille] because [he] never needed approval from her for any transaction that [he] made." (Second Deposition of David Albritton, ECF No. 130.6, at p. 11.)

17. Deborah testified in her deposition that she, David, and Charles made all of the financial decisions for the Bille Entities and APALP after Bille stopped attending the monthly management board meetings. (ECF No. 130.4, at p. 43.) However, Deborah also testified that David made all decisions regarding intercompany transfers between the Bille Entities without her involvement. (*Id*. at p. 48.)

18. It is undisputed that for some period of time prior to October 2018, David treated the assets of the Bille Entities as joint and interchangeable. (ECF No. 130.5, *passim*.) Among other transactions, David: directed the transfer of funds between the Bille Entities as needed to cover expenses of the companies; directed the payment of compensation and distributions to himself, Deborah, and Charles on an ad hoc basis from various Bille Entities; used company funds to pay for personal vehicles for himself and Deborah; used company funds to pay for his children's education; used company funds to pay expenses for his son's unrelated business; paid for life insurance policies on himself, Deborah, and Charles from company funds; directed payments of significant funds to an unrelated horse and saddle business owned by Charles and paid employees of that business from TAC funds. (*Id*.) David explained that, although the Bille Entities were separate companies and separate legal entities,

he viewed them as "one big pot and we really didn't care how much was in the individual pots [companies] because that's how we were looking at it as one big enterprise." (*Id*. at p. 40.) Accordingly, he "constantly" moved money around as needed to bolster the cash flow of the various entities. (*Id*. at p. 36.) David summarized his management of the Bille Entities as follows:

> [s]o to recap what I've previously stated, we looked at these companies as all of ours and as one big enterprise. So whether I took money out of this company or Deborah took money out of that company we all had an agreement that there was a limit to that, I mean, we just couldn't go in there and get anything we wanted. But we considered that all as compensation. Whether it was handled as a loan or an expense on the company's books really didn't matter to us.

(*Id*. at p. 58.)

19. In her deposition testimony, Deborah confirmed that the Bille Entities were run as one enterprise and that they often did not follow business formalities:

> Q. So when one entity needed money from another entity it's because that entity receiving the money wasn't doing well financially?
>
> A. Right. It all was considered one thing, one business, you know, we operated it that way.
>
> Q. And when you say "we" –
>
> A. Well, you know, we're a family business -- were, and so we didn't -- we didn't have the formalities of some of the businesses that, you know, weren't family.
>
> Q. Well, they were each separate entities, right?
>
> A. Correct.
>
> Q. Separate tax returns?

A. Right.

Q. And when you say "we didn't follow the formalities" who were you referring to?

A. Well, we didn't have documents signed every time money was transferred.

(ECF No. 130.4, at pp. 50–51.)

20. Although David and Deborah did not necessarily document each of the transfers David made, Jones stated that David kept a spreadsheet "matrix" of all of the intercompany and personal transfers that showed to which entity or individual transfers were made. (ECF No. 140.3, at pp. 25–33.)

**D. The Challenged Transactions and the Saddle Transaction**

21. In 2018, Bille retained accounting and legal professionals to determine the status of APALP and the Bille Entities. On or around September or October 2018, Bille first discovered what she believed to be numerous improprieties and unlawful acts committed by David and Deborah causing harm to APALP and the Bille Entities. (ECF No. 11, at ¶¶ 53, 55.) On October 4, 2018, Bille terminated David and Deborah from APALP and the Bille Entities for their alleged gross mismanagement and self-dealing. (*Id.* at ¶¶ 56–57.)

22. In their Amended Crossclaims, Bille and the Bille Entities allege numerous discrete improper transfers of assets and payments made from the Bille Entities by David, Deborah, and Charles that comprise the Challenged Transactions

and the Saddle Transaction.  (ECF No. 38, at ¶¶ 71–148.)  In the Motion, Bille and the Bille Entities seek damages arising from the Challenged Transactions as follows:

> The undisputed evidence establishes that Bille and the Bille Entities are entitled to judgment as a matter of law under theories of conversion, unjust enrichment, constructive fraud, or breach of contract based on unlawful transfers from Bille or the Bille Entities to Deborah, David, or ARG:
>
>   a. ERC is entitled to judgment against David for $341,706.18;
>   b. ERC is entitled to judgment against Deborah for $330,942.81;
>   c. ERC is entitled to a judgment against ARG for $210,450.00;
>   d. CCI is entitled to a judgment against Deborah for $48,500;
>   e. CCI is entitled to a judgment against David for $107,933.31;
>   f. CCI is entitled to a judgment against ARG for $256,508.67;
>   g. Bille is entitled to a judgment against David for $67,150.00.
>
> . . .
>
> 20.    The undisputed evidence establishes that Bille and the Bille Entities are entitled to judgment as a matter of law on the following claims:
>
>   a. Breach of fiduciary duty against David and Deborah for payments made by TAC to Charles' Horse and Saddle Business of a minimum of $700,000.00 for no legitimate business purpose;
>
>   b. Breach of fiduciary duty against David and Deborah for all transactions detailed in paragraph #18.

(ECF No. 129, at p. 5.)

23.    In their Mem. in Supp., Bille and the Bille Entities set out the specific amounts of damages being sought by Bille and each of the Bille Entities and the particular party against whom damages are sought.  (ECF No. 131, at p. 5.)

**E.    Defendants' Position**

24.    In response to the Motion, Defendants contend that "[w]hile Bille was the record owner . . . she had ceded all management authority to Charles, David and Deborah" and that "Bille did not maintain sole governing authority of the entities and that they were permitted to make decisions for these companies based on their roles as General Partners of Albritton Property Associates, LP, their roles as members of the management group that oversaw the companies, and David's role as manager of Bille's Entities." (ECF No. 140, at p. 3.)[3]  Defendants further contend that Bille's claim that she did not know about the Challenged Transactions and the Saddle Transaction is "opposed" by David's affidavit testimony and the testimony of Bille's accountant, Jones.  (*Id*. at pp. 4–5.)

25.    Finally, David and Deborah also claim that Bille told them on multiple occasions that she did not want to be informed about the operations or financial conditions of the Bille Entities because it caused her stress.  (ECF No. 130.4, at pp. 44–45, 96; ECF No. 130.5, at pp. 24–25.)

---

[3] The Court notes that Defendants' record citation following this statement in their Response in Opposition to Bille's deposition testimony (ECF No. 140.2, at p. 40) does not support the statement.

III.   ANALYSIS

26.   Due to the large number of claims, including counterclaims and crossclaims, raised by the parties, the Motion and Mem. in Supp. are confusing.[4] The Court believes that Movants seek summary judgment as to the following claims and affirmative defenses:

a. Movants first seek dismissal of David and Deborah's crossclaims for dissolution of APALP ("First Claim for Relief") and appointment of a receiver ("First and Second Claim[s] for Relief;" ECF No. 51, at pp. 32–33) because the claims are moot. Movants argue that "David, Deborah, and ARG's non-monetary claims for Dissolution and for an Appointment of a Receiver are now moot as Jason Hendren was appointed the Receiver on April 26, 2019 and tasked with the exclusive management and decision-making authority for APALP and to wind-up APALP and distribute its assets." (ECF No. 129, at p. 3.) Defendants do not respond to this argument, and the Court concludes that David and Deborah's crossclaims for dissolution of APALP ("First Claim for Relief") and appointment of a receiver ("Second Claim for Relief") should be DISMISSED as MOOT.

b. Movants seek summary judgment in their favor and against David, Deborah, and ARG as to the Challenged Transactions under Bille and Bille Entities' claims for breach of fiduciary duty ("First Claim," ECF No. 38, at

---

[4] Adding to the confusion, Movants attached to the Motion a series of charts purportedly setting forth the claims on which they seek summary judgment that appears, to this Court, to contradict certain assertions regarding the relief sought by the Motion contained in the Motion and Mem. in Supp. (ECF No. 129, at pp. 8–9.)

pp. 26–27), constructive fraud ("Third Claim for Relief," *Id.* at p. 28), conversion ("Fifth Claim," *Id.* at pp. 29–30), unjust enrichment ("Seventh Claim," *Id.* at pp. 31–32), and breach of contract ("Fifteenth Claim," *Id.* at pp. 36–37). (ECF No. 129, at p. 5.)

    c.  Movants seek summary judgment in their favor on TAC's claims against David as to the Saddle Transaction under Movants' claims for breach of fiduciary duty ("First Claim," ECF No. 38, at pp. 26–27.) (ECF No. 129, at p. 5.)

    d.  Movants also seek summary judgment in their favor on TAC's claims against Defendants as to the Challenged Transactions and the Saddle Transaction under Movants' claims for unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("UDTPA") ("Sixth Claim," ECF No. 38, at pp. 30–31). (ECF No. 129, at p. 5.)

    e.  Finally, Movants seek summary judgment in their favor and against Defendants on Defendants' affirmative defenses for: (i) bad faith, (ii) failure to mitigate, (iii) the Statute of Frauds, (iv) waiver, laches and tacit acceptance. (ECF No. 129, at p. 6.)

**A.    Standard of Review**

27.    "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is

entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235 (1972). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Ussery v. Branch Banking and Trust Co.*, 368 N.C. 325, 335 (2015) (citations and internal quotation marks omitted).

28. The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523.

29. Once the movant presents evidence in support of the motion, the nonmovant "cannot rely on the allegations or denials set forth in her pleading [ ] and must, instead, forecast sufficient evidence to show the existence of a genuine issue of material fact in order to preclude an award of summary judgment." *Steele v. Bowden*, 238 N.C. App. 566, 577 (2014) (internal citation omitted). In determining whether the non-movant has met its burden in opposing a motion for summary judgment, the

judge "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]" *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–55 (1986)) (quotations and emphasis omitted).

30.     In summary, this Court must decide "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Value Health Sols. v. Pharm. Research Assocs.*, 2021 NCBC LEXIS 37, at *29 (N.C. Super. Ct. Apr. 5, 2021) (citing *Anderson*, 477 U.S. at 251).

**B.     Breach of Fiduciary Duty and Constructive Fraud**

31.     In their first crossclaim, Movants bring a claim for breach of fiduciary duty on behalf of Care Center, ERC, and TAC against David and Deborah.[5]  (ECF No. 38, at p. 26–27.)  Movants allege that "Bille granted certain day-to-day functions of the Bille Entities to" David and Deborah and that "[a]s a result of this delegation [David and Deborah] owed a fiduciary duty to the Bille Entities." (*Id.*)  Movants allege that David and Deborah breached these duties by engaging in the Challenged Transactions and the Saddle Transaction.  (*Id.*)

---

[5] The allegations are purportedly against David, Deborah, and ARG.  (ECF No. 38, at pp. 26–27.)  However, Movants do not claim that ARG owed Movants a fiduciary duty nor do they allege any facts that could support such a claim.

32.     Movants' third claim is for constructive fraud against David and Deborah[6] based on the Challenged Transactions and the Saddle Transaction. (*Id.* at p. 28.) Movants allege a "relationship of trust and confidence existed between [Bille] and the Bille Entities and" David and Deborah, and that they "used their position of trust and confidence to cause damages to "[Bille] and the Bille Entities in numerous transactions, which were to the detriment of [Bille] and the Bille Entities and for the benefit of" David and Deborah. (*Id.*)

33.     As a preliminary matter, in their Mem. in Supp., Movants clarify the scope of the Motion, stating that "TAC does not seek summary judgment against Deborah on its breach of fiduciary claim." (ECF No. 131, at p. 17 n.2.) Accordingly, the Court need only consider TAC's claim for breach of fiduciary duty to the extent that claim is asserted against David.

34.     A fiduciary relationship is defined as "one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dalton v. Camp*, 353 N.C. 647, 651 (2001) (internal quotations omitted). In order to establish a claim for breach of fiduciary duty, the plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68 (2006). A claim

---

[6] The allegations are purportedly against David, Deborah, and ARG. (ECF No. 38, at p. 28.) However, Movants do not claim that ARG owed Movants a fiduciary duty nor do they allege any facts that could support such a claim.

for constructive fraud requires that the plaintiff prove a breach of a fiduciary duty and also that the defendant benefitted himself as a result of the breach. *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620 (2012) ("To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction.").

35.     Under North Carolina law, corporate officers owe fiduciary duties to the corporation, and must discharge their duties "(1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner [the officer] reasonably believes to be in the best interest of the corporation." N.C.G.S. § 55-8-42(a); *accord Seraph Garrison, LLC v. Garrison*, 247 N.C. App. 115, 787 S.E.2d 398 (2016). In *Seraph Garrison*, the North Carolina summarized the duties as follows:

> [C]orporate directors and officers act in a fiduciary capacity in the sense that they owe the corporation the duties of loyalty and due care.
>
> Subdivision 55-8-42(a)(2) outlines the standard by which an officer's duty of care is measured. Its specific language—in a "like a position" and "under similar circumstances"—acknowledges [ ] that [officers'] responsibilities will vary from corporation to corporation. The same holds true for the corporate decision-making processes that are employed. Even so, subdivision 55-8-42(a)(2) also imposes an affirmative duty on officers: it requires them to assume an active and direct role in the matters that are under their authority.
>
> Subdivision 55-8-42(a)(3) codifies the requirement that an officer always discharge the responsibilities of the office "with undivided loyalty" to the corporation. The corporate

law duty of loyalty also imposes an affirmative obligation: a fiduciary must strive to advance the best interests of the corporation.

Second, while subsection 55-8-42(a) requires an officer to act in good faith, this concept cannot be separated from the duties of loyalty and due care. In other words, the obligation to act in good faith does not create a discrete, independent fiduciary duty. Rather, good faith is better understood as an essential component of the duty of loyalty. A leading authority on North Carolina business law has also recognized this obligation as a component of the duty of due care: "The requirement of good faith is listed separately in [subsections 55-8-30(a) and 55-8-42(a),] . . . but it normally operates . . . as a component of the other two traditional duties, requiring conscientious effort in discharging the duty of care and constituting the very core of the duty of loyalty." Thus, the requirement of good faith is subsumed under an officer's duties to the corporation; it is a primary and comprehensive obligation that compels an officer to discharge his responsibilities openly, honestly, conscientiously, and with the utmost devotion to the corporation.

Third, context matters: the analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which he serves the corporation. The same holds true for any examination of "good faith," an inquiry that presents a mixed question of law and fact: Whether a party has acted in good faith is a question of fact for the trier of fact, but the standard by which the party's conduct is to be measured is one of law. In making the determination as to whether a party's actions constitute a lack of good faith, the circumstances and context in which the party acted must be considered.

*Seraph Garrison,* 787 S.E.2d at 403–04 (cleaned up).

36.     The evidence regarding Deborah's roles in the management of Care Centers, and ERC is, at best, vague and is conflicting as to what, if any, role Deborah played in any of the Challenged Transactions. The Court concludes that the question

of whether Deborah owed fiduciary duties to Care Centers and ERC is in dispute. Therefore, to the extent Movants seek summary judgment against Deborah as to their claims for breach of fiduciary duties to Care Centers and ERC, the Court concludes that the Motion should be DENIED.

37.     The Movants also have failed to present evidence that David and Deborah personally benefitted from the Saddle Transaction since the saddle business was owned exclusively by Charles.  Therefore, the evidence currently before the Court does not support a claim of constructive fraud against David and Deborah, and to the extent Movants seek summary judgment against David and Deborah as to TAC's claim for constructive fraud, the Motion should be DENIED.

38.     David admits that he was an officer of TAC, Care Centers, and ERC, and there is no dispute that he owed fiduciary duties to those corporations.  It also is undisputed that David could not provide any explanation as to how the Challenged Transactions served the business interests of Care Centers or ERC, or how the Saddle Transaction was in the interest of TAC.  To the contrary, David admits that he believed that the Bille Entities were "one big pot" and "one big enterprise" (ECF No. 130.5, at p. 40), and transferred funds between, and took money out of, the Bille Entities with the belief that he, Deborah, and Charles would ultimately be the owners of those entities.

39.     As discussed above, the evidence regarding whether Bille knew of and approved of the Challenged Transactions is hotly disputed.  In response to Care Centers', ERC's, and TAC's claims for breach of fiduciary duties, Defendants contend:

that Bille "ceded all management authority" in APALP and Bille Entities to Charles, David, and Deborah (ECF No. 140, at pp. 2–3); that "[t]he question as to who had what authority to make certain transfers during a specific period of time is a fundamental, disputed question of fact in this case" (*Id*. at p. 7); and that Plaintiffs have failed to show that any of the transfers or transactions were wrongful in the context of this business" (*Id*. at p. 6). In summary, Defendants argue that

> [i]n order to succeed on her allegation of a breach of duty at trial, Bille must prove to a jury that she did not authorize and did not know of the transactions to Charles' saddle business. She never once complained. She must not now be allowed to claim that any transaction that she now disapproves of was wrong and damaging to her and her companies.

(*Id*. at p. 7.)

40. The facts regarding whether Bille knew about and authorized David to engage in the Challenged Transactions and the Saddle Transaction are in dispute. Since Bille was the sole shareholder in the Bille Entities, if Bille authorized David's and Deborah's conduct, Defendants may be able to establish that the transactions were not a breach of their fiduciary duties to those entities. As one court has held,

> [i]n determining whether [plaintiff], as sole shareholder, is liable for breach of a fiduciary duty, we may look to analogous situations in other jurisdictions where a sole shareholder's acts, which may be detrimental to the corporation, have been held not to give rise to liability. For example, it has been held that shareholders, when acting unanimously, may ratify acts which amount to waste or gift of corporate assets . . . [and] if an officer of the company owns all the stock he may use the corporate assets as he sees fit and there can be no misappropriation of corporate assets by him. In addition, it has been held that, although generally majority shareholders cannot make a gift

> of corporate property, a person owning all of the legal and equitable interest in a corporation may give away the corporate assets.

*Pittman v. American Metal Forming Corp.*, 649 A.2d 356, 363–64 (Md. 1994) (cleaned up); *see also Anderson v. Benson*, 394 N.W.2d 171, 175 (Minn. Ct. App. 1986) ("A sole shareholder of a corporation is free to dispose of corporate assets to his or her own liking, so long as the corporation or its creditors are not harmed or defrauded, or no public policy is violated.").

41. In addition, whether an officer has breached fiduciary duties must be viewed against the structure and nature of the particular business (or businesses) at issue. An "[officer's] responsibilities will vary from corporation to corporation. The same holds true for the corporate decision-making processes that are employed." *Seraph Garrison*, 787 S.E.2d at 403. Furthermore, "[c]ontext matters: the analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which he serves the corporation . . . . Whether a party has acted in good faith is a question of fact for the trier of fact, . . . . In making the determination as to whether a party's actions constitute a lack of good faith, the circumstances and context in which the party acted must be considered." *Id*. at 404.

42. APALP and the Bille Entities were small, closely held family businesses. Defendants have presented evidence that Bille intended to transfer her ownership in APALP and the Bille Entities, that she was aware of and expressly or tacitly authorized David and Deborah to engage in the Challenged Transactions and the Saddle Transaction, and that she removed herself from management of APALP and

the Bille Entities and asked David and Deborah not to provide her with the details regarding the operations of the companies. While these facts are disputed by Movants, the Court believes a jury should determine whether the Challenged Transactions and the Saddle Transaction, viewed in context, were breaches of the duties David owed to the companies.

43. Therefore, to the extent Movants seek summary judgment against David as to Care Centers', ERC's, and TAC's claims for breach of fiduciary duty, the Motion should be DENIED.

## C. Conversion

44. In their fifth crossclaim, Movants allege claims for conversion against David, Deborah, and ARG based on the Challenged Transactions and the Saddle Transaction. (ECF No. 38, at pp. 29–30.) Movants allege that Bille and the Bille Entities were the "owner[s] of various assets, including monies in their bank accounts and access to credit card accounts in their name, and were entitled to their immediate possession." (*Id.* at p. 29.) Movants further allege that Defendants "unlawfully converted said assets to their own use and did not return the assets, nor pay for the personal charges made on Bille's credit card, even after demand from the Responding Defendant." (*Id.* at p. 30.)

45. Under North Carolina law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc.*, 365 N.C. at 523 (citation omitted). There are two elements

in a claim for conversion: (1) the plaintiff's ownership, and (2) the defendant's wrongful possession. *Id.* Money, such as the funds at issue here, can be the subject of a claim for conversion where they can "be sufficiently identified through evidence of the specific source, specific amount, and specific destination of the funds in question." *Id.* at 529. Defendants do not argue that Movants have not sufficiently identified the funds at issue in their conversion claim.

46. Defendants contend that Movants are not entitled to summary judgment on the conversion claim "because there is a genuine issue of material fact of whether or not Bille knew of the transactions or transfers complained of by plaintiff, whether or not she had tacitly authorized such actions by ceding operation control to defendants and whether or not the transfers themselves were in fact wrongful." (ECF No. 140, at p. 6.) In support, Defendants contend that it is undisputed that Bille had given David and Deborah the authority to operate the Bille Entities and removed herself from the day-to-day management of the companies. (ECF No. 140, at p. 5.) They also cite to David's sworn affidavit testimony that "Bille knew that there were various intercompany transactions and distributions or payments to or on behalf of other companies, such as ARG and Charles' businesses and various members of the group, including herself" (ECF No. 140.1, at ¶ 13), and Bille's admission that she knew that David and Deborah "moved money around from this company to that company" (ECF No. 140.3, at p. 110). Finally, Defendants assert that Jones "testified that he personally informed Bille of the discussions in the management board meetings after she chose to stop attending and that he reviewed

with and answered questions about her personal and corporate tax returns and documents, prior to her signing the same." (ECF No. 140, at p. 5.)

47. The Court finds Defendants' argument persuasive. To prove the claims for conversion, Movants must show that David was not authorized to make the Challenged Transactions and the Saddle Transaction. *See Variety Wholesalers, Inc.*, 365 N.C. at 523. While Bille claims in her affidavit that she did not "know of" or "approve" the Challenged Transactions and the Saddle Transaction (ECF No.. 130.1, *passim*), Defendants have provided at least some evidence that she knew about and had given David authority to make transfers of funds and assets as he saw fit. Bille was the sole shareholder and owner of the Bille Entities and, therefore, she was free to do what she wished with the funds. *See L. R. Schmaus Co. v. Commissioner*, 406 F.2d 1044, 1045 (7th Cir. 1969) ("[I]f an officer of the company owns all the stock, he may use the corporate assets as he sees fit and there can be no misappropriation of corporate assets by him.").

48. The facts are in dispute as to whether Bille authorized the transactions and a jury will need to determine the truth of the matter. Movants are not entitled to summary judgment on their claims for conversion. Therefore, to the extent Movants seek summary judgment in their favor as to the claims for conversion, the Motion should be DENIED.

**D. Breach of contract**

49. Movants purport to allege a claim for breach of contract, but fail to allege the terms of the contract or agreement at issue. (ECF No. 38, at ¶¶ 217–222.)

Instead, they allege only that "Defendants" breached an implied covenant of good faith in some unidentified contract or agreement. (*Id.*) Movants' entire argument in support of the breach of contract claim in the Mem. in Supp. is as follows: "[a]lternatively, to the extent that Deborah, David or ARG contend the transfers were a series of loan [sic], then Bille, ERC, and CCI are entitled to be paid back on those by David, Deborah, and ARG under a breach of contract claim." (ECF No. 131, at p. 17.)

50. The Court concludes that Movants have failed to identify the undisputed facts, and have not argued why they are entitled to judgment as a matter of law. *See Hensley*, 193 N.C. App. at 563 (stating that under Rule 56, "the movant bears the burden of showing that there is no triable issue of fact and that he is entitled to judgment as a matter of law" (quotations and citation omitted)).

51. Therefore, to the extent Movants seek summary judgment in their favor as to the claims for breach of contract, the Motion should be DENIED.

### E. Unjust enrichment

52. Movants purport to allege a claim for unjust enrichment "in the alternative" to their claim for conversion. (ECF No. 38, at ¶¶ 30–31.) Movants allege that Defendants "took certain property of [Bille] and the Bille Entities without authority, . . . , conferring a benefit on" Defendants; that "[a]t the time of the taking of the property, and upon discovery of the same, [Bille] and the Bille Entities expected to be paid back"; and that "[t]o the extent that said conduct does not constitute

conversion, [Bille] and the Bille Entities are entitled to the return of said property, or the reasonable value of the property." (*Id.* at ¶¶ 186, 188, 189.)

53. A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966) (citations omitted). In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002).

54. Neither the allegations nor the facts in evidence support a claim for unjust enrichment. Movants have not alleged that Bille or the Bille Entities *conferred* benefits upon Defendants, but, rather, that Defendants took assets belonging to Bille. In fact, Bille claims she did not know about the Challenged Transactions or the Saddle Transaction at the time they occurred. Rather, at best, the evidence supports claims that Defendants wrongfully transferred funds or property belonging to Movants that Movants believe Defendants should be required to repay. As this Court has stated:

> [a]lleging merely that the Defendants have taken for themselves some benefit to which Plaintiff believes it is

> rightfully entitled does not state a claim for unjust enrichment. Rather, a claim for unjust enrichment must be based on a contract implied in law in which one party has provided a benefit to another, such as goods or services, for which the first party should rightfully be compensated. [Plaintiff] does not allege that it conferred a benefit on Defendants; only that Defendants violated its rights and thereby obtained some benefit to themselves for which [Plaintiff] believes it should be awarded damages.

*KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *36–37 (N.C. Super. Ct. Oct. 9, 2019) (citing *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *31–32 (NC Super. Ct. Nov. 7, 2017)) (unjust enrichment claim dismissed where plaintiff did "not allege that he conferred any benefit on the [defendants], but rather only that the [defendants] 'received' or 'wrongfully retained' benefits from their alleged misconduct."); *see also Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *15–18 (N.C. Super. Ct. Jan. 12, 2017) (holding that an unjust enrichment claim failed where plaintiff alleged only that it was damaged by defendants' conduct and not that it had conferred a benefit on defendant company).

55.     The unjust enrichment claim is a repackaging of Movants' claims for breach of fiduciary duty and conversion, and neither the undisputed facts nor the law supports a claim for unjust enrichment in this case. *See Islet Scis., Inc.*, 2017 NCBC LEXIS 4, at *17–18. Therefore, to the extent Movants seek summary judgment in their favor as to the claim for unjust enrichment, the Motion should be DENIED.

**F.     Unfair trade practices**

56.     Movants also allege that by making the Challenged Transactions and the Saddle Transaction, Defendants have engaged in unfair or deceptive trade

practices in violation of the UDTPA. (ECF No. 38, at pp. 30–31.) The Court concludes that the same disputed issues of fact about whether Bille authorized the Challenged Transactions and the Saddle Transaction also preclude granting summary judgment in Movant's favor on the UDTPA claim. Therefore, to the extent Movants seek summary judgment in their favor as to the claim for unfair or deceptive trade practices in violation of the UDTPA, the Motion should be DENIED.

## G. Defendants' affirmative defenses

57. In their Answer, Defendants raise defenses of: (i) bad faith, (ii) failure to mitigate, (iii) the Statute of Frauds, (iv) waiver, laches and tacit acceptance. (ECF No. 51, at p. 16.) Movants seek summary judgment in their favor and against Defendants as to the affirmative defenses. (ECF No. 129, at p. 6; ECF No. 130, at pp. 21–22.) Movants contend that the affirmative defenses have no application to the issues raised by its crossclaims and that Defendants do not have evidence to support the defenses. (ECF No. 130, at pp. 21–22.) Defendants make no argument in opposition to Movants' contentions and provide no evidence in support of their affirmative defenses. Therefore, the Court concludes that, to the extent Movants seek summary judgment in their favor on Defendants' affirmative defenses for bad faith, failure to mitigate, the Statute of Frauds, and waiver, laches and tacit acceptance, the Motion should be GRANTED.

## IV. CONCLUSION

THEREFORE, IT IS ORDERED that the Motion is GRANTED in part, and DENIED, in part, as follows:

1. David and Deborah's crossclaims for dissolution of APALP ("First Claim for Relief") and appointment of a receiver ("Second Claim for Relief") are DISMISSED as MOOT.

2. To the extent Movants seek summary judgment against Deborah as to their claims for breach of fiduciary duties to Care Centers and ERC, the Motion is DENIED.

3. To the extent Movants seek summary judgment against David and Deborah as to TAC's claim for constructive fraud, the Motion is DENIED.

4. To the extent Movants seek summary judgment against David as to Care Centers', ERC's, and TAC's claims for breach of fiduciary duty, the Motion is DENIED.

5. To the extent Movants seek summary judgment in their favor as to their claims for conversion, the Motion is DENIED.

6. To the extent Movants seek summary judgment in their favor as to their claims for breach of contract, the Motion is DENIED.

7. To the extent Movants seek summary judgment in their favor as to their claim for unjust enrichment, the Motion is DENIED.

8. To the extent Movants seek summary judgment in their favor as to their claim for unfair or deceptive trade practices in violation of the UDTPA, the Motion is DENIED.

9. To the extent Movants seek summary judgment in their favor on Defendants' affirmative defenses for bad faith, failure to mitigate, the Statute of Frauds, and waiver, laches, and tacit acceptance, the Motion is GRANTED.

SO ORDERED, this the 7th day of June, 2021.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases